**Robert DOYLE, Plaintiff, Appellee,**

v.

**The PAUL REVERE LIFE INSURANCE COMPANY, Defendant, Appellant.**

No. 97–1275.

United States Court of Appeals, First Circuit.

Heard Nov. 7, 1997.

Decided June 2, 1998.

Joseph M. Hamilton with whom Mirick, O'Connell, DeMallie & Lougee was on brief for appellant.

Mark T. Collins for appellee.

Before STAHL, Circuit Judge, ALDRICH and COFFIN, Senior Circuit Judges.

ALDRICH, Senior Circuit Judge.

Plaintiff-appellee Robert Doyle, as an engineer at Textron, Inc., was insured for long term total disability benefits under a group policy issued to Textron by defendant-appellant Paul Revere Life Insurance Company (Paul Revere) pursuant to an employee welfare benefit plan. The plan is subject to the Employee Retirement and Income Security Act (ERISA), 29 U.S.C. § 1001, *et seq.;* the policy was managed by Paul Revere. After Doyle ceased work in December 1989, he applied for and received interim benefits. Paul Revere discontinued them on March 27, 1991 when it found him not totally disabled, and therefore ineligible, and it rejected his later appeal. The principal issue here is whether the district court erred in denying Paul Revere's motion for summary judgment and, instead, entering summary judgment for Doyle.[1] We reverse.

### Review

We review the district court's grant of summary judgment *de novo.* *See Grenier v. Cyanamid Plastics, Inc.,* 70 F.3d 667, 671 (1st Cir.1995); *Allen v. Adage, Inc.,* 967 F.2d 695, 699 (1st Cir.1992). Our first question is Paul Revere's authority to determine eligibility. The parties agree that it had discretion. Normally this means that its decision must be upheld unless "arbitrary, capricious, or an abuse of discretion." *Diaz v. Seafarers Int'l Union,* 13 F.3d 454, 456 (1st Cir.1994); *see also Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 111–15, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989); *Recupero v. New England Tel. & Tel. Co.,* 118 F.3d 820, 828 (1st

---

1. Strictly, Paul Revere appeals from the summary judgment for Doyle. This left Paul Revere's motion effectively denied as moot. The motions are obverse, and, because there are no issues on either side that would require a trial, reversal of Doyle's judgment permits the granting of Paul Revere's.

Cir.1997). This standard means that its decision will be upheld if it was within Paul Revere's authority, reasoned, and "supported by substantial evidence in the record." *Associated Fisheries of Maine, Inc. v. Daley,* 127 F.3d 104, 109 (1st Cir.1997) (Administrative Procedure Act). Substantial evidence, in turn, means evidence reasonably sufficient to support a conclusion. Sufficiency, of course, does not disappear merely by reason of contradictory evidence. *See Sprague v. Director, O.W.C.P.,* 688 F.2d 862, 865–66 (1st Cir.1982); *see also Sandoval v. Aetna Life & Cas. Ins. Co.,* 967 F.2d 377, 382 (10th Cir. 1992); *Jett v. Blue Cross & Blue Shield of Alabama, Inc.,* 890 F.2d 1137, 1140 (11th Cir.1989).

■ This deferential standard may not be warranted, however, when a conflict of interest exists, such as when the policy manager has a personal interest contrary to the beneficiary's. In this case, any award of benefits would come out of Paul Revere's own pocket. Plaintiff notes, also, that Paul Revere was a Textron subsidiary. However, here we suggest an important competing motive: having a benefit plan is to please employees, not to result in the employer's bad reputation. *See Van Boxel v. Journal Co. Employees' Pension Trust,* 836 F.2d 1048, 1051 (7th Cir. 1987). Indeed, we venture that an employer would not want to keep an overly tight-fisted insurer. The conflict is not as serious as might appear at first blush.

The question comes as to how this should be handled. The circuits have varied from giving the manager no deference, *see Armstrong v. Aetna Life Ins. Co.,* 128 F.3d 1263, 1265 (8th Cir.1997) (2–1 decision; *reh'g and suggestion for reh'g en banc denied*), to shifting the burden of exoneration to the insurer, *see Brown v. Blue Cross & Blue Shield of Alabama,* 898 F.2d 1556, 1566 (11th Cir.1990), *cert. denied,* 498 U.S. 1040, 111 S.Ct. 712, 112 L.Ed.2d 701 (1991), to applying a sliding scale involving "careful judicial scrutiny to make sure the[ ] action was reasonable," *Van Boxel,* 836 F.2d at 1053.

■ There are advantages in having a simple procedure, *cf. Sandoval,* 967 F.2d at 380, which the *Armstrong* approach forecloses despite the parties' agreement to accept the insurer's discretion. The Massachusetts district court has prophesied that in case of conflict our court would merely "giv[e] 'more bite' to the arbitrary and capricious standard." *Doe v. Travelers Ins. Co.,* 971 F.Supp. 623, 630 (D.Mass.1997). We so do, interpreting "more bite" as adhering to the arbitrary and capricious principle, with special emphasis on reasonableness, but with the burden on the claimant to show that the decision was improperly motivated. *Cf. Sullivan v. LTV Aerospace & Defense Co.,* 82 F.3d 1251, 1255 (2d Cir.1996). To do more would sacrifice the advantages of the offered arrangement. Doyle has made no showing except to point out the subsidiary relationship and the fact that Paul Revere decided which claims it would pay, which is not enough.

This leaves our question not which side we believe is right, but whether Paul Revere had substantial evidentiary grounds for a reasonable decision in its favor. We first review the policy, and after, the evidence.

### The Policy

■ An employee is eligible for benefits under the policy if "totally disabled from any occupation."

> *Totally disabled from any occupation, or total disability from any occupation* means:
>
> 1. because of injury or sickness, the employee is *completely prevented* from engaging in any occupation for which he is or may become suited by education, training or experience .... (emphasis added).

We, of course, agree that such " 'general' disability provisions should not be construed so literally that an individual must be utterly helpless to be considered disabled." *Hammond v. Fidelity & Guar. Life Ins. Co.,* 965 F.2d 428, 431 (7th Cir.1992). How far from that has been variously, and perhaps even irreconcilably, described. *See, e.g., id.* (unable to "perform all the substantial and material acts necessary to the prosecution of some gainful business or occupation"); *VanderKlok v. Provident Life & Accident Ins. Co.,* 956 F.2d 610, 615 (6th Cir.1992) (unable

to "pursue 'gainful employment in light of all the circumstances.' " (citation omitted)); *Torix v. Ball Corp.*, 862 F.2d 1428, 1431 (10th Cir.1988) ("inability to follow any occupation from which [the claimant] can earn a reasonably substantial income rising to the dignity of an income or livelihood"); *Helms v. Monsanto Co.*, 728 F.2d 1416, 1420 (11th Cir.1984) (same); *Boss v. Travelers Ins. Co.*, 4 N.E.2d 468, 296 Mass. 18, 22 (1936) (unable to "perform[ ] remunerative work of a substantial and not merely trifling character" (quotations and citation omitted)). In addition to "totally disabled," we note the policy reads "completely prevented," a further emphasis. Within reason, Paul Revere's discretionary power includes not only factual findings as to plaintiff's condition, but interpretation of policy terms. *See Allen*, 967 F.2d at 697; *cf. Marecek v. BellSouth Telecommunications, Inc.*, 49 F.3d 702, 705 (11th Cir.1995).

### The Evidence

In favor of Paul Revere is the following. Paul Revere sent Doyle to a neurosurgeon, Dr. Bruce Cook, in October 1990 for an Independent Medical Examination. It provided Dr. Cook with medical information from its files and a description of Doyle's job, and also asked Doyle to provide Dr. Cook with "any other information that pertains to your condition." Asked to determine Doyle's medical restrictions and assess their effect on his ability to do his job at Textron, Dr. Cook said, "I do not think that the mild residual myelopathy impairs him from either the written or verbal description that I was given." Acknowledging Doyle's "pain syndrome," he offered that treatment should focus on adjusting Doyle's physical position at work to reduce strain on his neck, and he recommended supervision by an occupational therapist. He concluded, "His restrictions in work would be predominantly in the physical realm where he should not do any lifting, bending or stretching and should be able to change positions on a frequent basis."

Apparently on Dr. Cook's advice, Paul Revere had Doyle meet with Brian Delahanty, a rehabilitation consultant, in January 1991. Delahanty had information about Doyle's previous work history, education (college degrees in engineering and business management), medical history, and "expressed current functioning levels." Delahanty concluded that, although Doyle was pessimistic, "Various job modifications are available that would allow Mr. Doyle to perform computer related employment utilizing his engineering skills," and he contemplated Doyle returning to work at Textron in a modified position.

On Delahanty's recommendation, Paul Revere had Doyle undergo a Physical Capacity Evaluation in February 1991 at the New England Rehabilitation Center of Southern New Hampshire (NERC). A physical therapist and an occupational therapist, asked to determine his ability to do his former job, assessed Doyle over the course of three hours. Among other details, they documented his expressed functional tolerances: 30–60 minutes for sitting (45 observed); 10 minutes for standing (15 observed); one third mile for walking; 15 miles for driving; and 15–20 miles for car riding. After describing other limitations, many due to pain, they concluded that Doyle had a "sedentary work capacity" at that time and recommended a "comprehensive pain program" involving various therapies in order to "facilitate a gradual return to work" in his former position. They also recommended that Doyle have a "job site visit to alter or adjust the environment to facilitate proper body positioning thus decreasing [his] pain and allowing [him] to return to work part time."

Following up the NERC report, Delahanty contacted Doyle to discuss work and rehabilitation options, including the recommended "pain program." (Paul Revere previously had agreed to continue benefits for six months while Doyle participated in rehabilitation.) Doyle repeatedly expressed resolute pessimism as to his ability to work or even to attempt rehabilitation. Although it is true, as Doyle said much later, that he never expressly declined it, both Delahanty and Paul Revere understood him to refuse to participate. The record, on the whole, supports them. Although the policy did not require Paul Revere to rehabilitate Doyle, its willingness to do so bolsters its overall reasonableness.

On the basis of this evidence, Paul Revere found Doyle not totally disabled and discontinued benefits in March 1991. We accept that the evidence sufficiently supports the conclusion that Doyle, fifty-four years old, college educated in both engineering and business management, and most recently working as a senior engineer for a major defense contractor, was not "totally disabled from any occupation" because he retained a "sedentary" work capacity and a potential for further rehabilitation that Paul Revere was willing to pursue with a combination of job-site restructuring, further therapy, and decreased hours. That his capacity, initially at least, may have been limited to part-time work does not require concluding otherwise.[2] Cf. *August v. Offices Unlimited, Inc.*, 981 F.2d 576, 582 (1st Cir.1992) (implying that total disability means inability to work either part-time or full-time); *Marecek*, 49 F.3d at 705 (finding that part-time work capacity precluded total disability status); *Simari's Case*, 11 Mass.App.Ct. 904, 414 N.E.2d 629 (1981) (workmen's compensation) (noting that one who was capable of "light part-time sedentary work" and who could, with treatment, resume full-time work was not permanently and totally disabled).

### Conclusion

The collection of conflicting expert opinions is on the whole equivocal, the fault of

Paul Revere, whose practice was to ask about limitations on claimant's ability to do his present job, not "any occupation." Nevertheless, we believe we have recited an ample basis within a reasonable interpretation of the policy terms. One interesting circumstance is the opinions, given prior to termination of benefits, in which Dr. Donald Pettit (Doyle's treating physician) maintained the totality of Doyle's disability, coupled with assurances that he saw no hope for the future, contrasted with his finding in September 1993 effectively conceding at least half-time work capacity.[3] It is true, of course, that Paul Revere did not have the latter information in March 1991, and that this described Doyle's condition two and a half years later, but, by confirming, it does lend color to the earlier appraisals relied upon by Paul Revere.

It is a matter of judgment, but we have given much thought to the record appertaining to Doyle's submissions before termination of benefits in March 1991, including the careful opinion of the district court, as to which, however, see *Review, supra*, and we conclude in favor of defendant. Paul Revere's denial was reasonably supported by substantial evidence. The court erred by not granting summary judgment on Count I in its favor. This, automatically, ends the case for later years.[4]

---

2. The dissent argues that Paul Revere acted arbitrarily and irrationally in refusing to find Doyle to be "totally disabled" based on his reports of debilitating pain. In our view, however, the evidence concerning Doyle's pain is not so overwhelming that it could be thought to *compel* a finding of total disability. Although the dissent suggests that Doyle's pain was an "insurmountable barrier" that prevented him from undertaking even sedentary work, none of the reports discussed by the dissent describes Doyle's symptomology in such unequivocal terms. Indeed, while the reports do acknowledge Doyle's complaints of pain, they express no opinion as to whether his pain symptoms were sufficiently severe to prevent him from returning to work. The record as a whole leaves this an open question. It is particularly noteworthy that the NERC found a presently existing sedentary work capacity despite the well-documented pain limitations. Further, the suggested pain program was intended to return Doyle to his former job, not "any occupation." We think it follows that it could not have been irrational or arbitrary for Paul Revere to decide that Doyle retained some resid-

ual capacity for work, *notwithstanding* his complaints of chronic pain. Finally, with respect to the dissent's ultimate conclusion, Paul Revere did view the expert evidence that Doyle offered at the Social Security hearing. We cannot think it arbitrary for it to "ignore" the lay ALJ's decision thereon.

3. Dr. Pettit performed a Residual Functional Capacity Evaluation in September 1993. He concluded that, in an eight hour workday, Doyle was able to sit for up to four hours, stand for up to two, walk for up to one, and do a combination of the three for up to four. He could "occasionally" (0% to 33%) lift and carry up to ten pounds. He was able to use both hands for simple grasping, pushing and pulling, and fine manipulating. He could use both feet for repetitive movements, such as operating foot controls. Finally, he could bend or reach above shoulder level occasionally, but could not squat, crawl, or climb.

4. Eligibility requires an employee to have been working fulltime at the time he became totally disabled and to remain totally disabled thereaf-

The summary judgment for Doyle is reversed; judgment to be ordered for Paul Revere.

COFFIN, Senior Circuit Judge, dissenting.

My problem with the court's resolution lies not in its choice of standard of review but in its reading of the evidence from which it concludes that "Paul Revere's denial was reasonably supported by substantial evidence."

I begin with the court's reading of the report of Dr. Cook, a neurosurgeon. The essence of the doctor's conclusions is the following:

It is my feeling that the decompressive surgery in his neck has been successful in relieving pressure of the spinal cord and allowing a partial though incomplete recovery of spinal cord function. Mr. Doyle now has a chronic pain problem associated with immobility in the neck. I do not think that the mild residual myelopathy impairs him from either the written or verbal description that I was given. I think that his disability centers around a chronic pain syndrome. The only measurable aspect of this is the associated immobility in the neck which is rather severe and detailed above. I do not think that any further testing is required to better elucidate the problem.

The various positions required of Mr. Doyle in order to perform his work, especially at the computer terminal, seem to exacerbate the pain that he has been having and, by his description, have made work intolerable to him. I think that any attempt at treatment would have to revolve around addressing these issues and seeing if there is any adjustment that can be made in his position of work to diminish the strain on the neck.

Appendix p. 127. My reading of these conclusions is that (1) Doyle has two sources of disability: residual myelopathy [or constriction of the spinal cord] and chronic pain syndrome; (2) the former does not impair him from the written or verbal description of his work; (3) but his disability "centers around a chronic pain syndrome," of which a measurable aspect was his rather severe neck immobility; and (4) any treatment would have to address the pain problem and see if any adjustment in work position can diminish the strain on his neck.

The court, in my view, downplays the impact of pain by saying that the pain syndrome was acknowledged, rather than that Doyle's disability "centers" around it. The doctor's conclusion based on the residual myelopathy is not a conclusion as to his total disability. In addition, I read the doctor's recommendations as to treatment as essential steps to the diminishment of pain, the center of his disability. I further see no suggestion in the record that the doctor, or in fact any other doctor, felt that Doyle was fabricating or exaggerating his pain. Dr. Cook's conclusion that work restrictions would be in the realm of lifting, etc., was necessarily contingent on the amelioration of pain.

I also have a different understanding of what rehabilitation consultant Delahanty said in his first letter in January, 1991. Doyle, he acknowledged, had been "an outstanding employee." He also wrote that Doyle "present[ed]" to him "an extremely disabled state with limited insight as to returning to competitive employment." Delahanty passed no present judgment on Doyle's disability. Delahanty recognized that all his information had come from Doyle and that a Physical Capacities Evaluation was needed to establish "some base line functionary levels."

ter. Thus, because substantial evidence supports Paul Revere's finding that he was not totally disabled in March 1991 (assuming he was totally disabled from December 1989 to that time), Doyle could not later become eligible. Therefore, we need not consider Count II, which sought benefits from the date of judgment until the earlier of his 65th birthday or the date he was no longer totally disabled. Also, we need not consider assessments of his post-March 1991

condition, nor assessments of his condition in 1990–91 that Paul Revere received after that date. Even assuming the Social Security Administration's November 1991 award of benefits, made on the basis of the same information before Paul Revere, could have any relevance, it had no binding effect. *See, e.g., Cox v. Mid–America Dairymen, Inc.,* 965 F.2d 569, 572–73 (8th Cir. 1992).

In other words, I read Delahanty's conclusion that "various job modifications are available ..." to depend on some ascertainment of what Doyle could really do. I see nothing to suggest that Delahanty "contemplated Doyle returning to work at Textron in a modified position" in the sense that he thought Doyle was *at that time* able to return to work.

The third piece of evidence relied on by the court was the Physical Capacity Evaluation of the New England Rehabilitation Center. After stating that, during the three-hour evaluation, Doyle "was limited in his activities due to poor endurance, pain, pain behaviors and decreased tolerance," its concluding paragraph stated:

At this time, [patient] presents with a sedentary work capacity. To facilitate a gradual return to work, [patient] may benefit from a comprehensive pain program involving Psychology, Occupational Therapy, Physical Therapy and Biofeedback for symptom control, pain management strategies and reeducation as well as to increase functional status. If [patient] were to do well with the above, it is recommended that [patient] have a job site visit to alter or adjust the environment to facilitate proper body positioning thus decreasing [patient's] pain and allowing [patient] to return to work part time.

Appendix p. 168.

The court's summary gave, in my view, short shrift to the report of pain, with no suggestion of contrivance on the part of Doyle, and again overlooked the conditional nature of the Center's assessment of "a sedentary work capacity." The "comprehensive pain program" was not merely to facilitate a "gradual return to work" in the sense of easing the return, but its success was a precondition. "If [patient] were to do well with the above," then a job site visit to help body positioning would be the next step to "decreas[e] [patient's] pain and allow[ ] [patient] to return to work part time."

My reading of these three reports supports the conclusion that Doyle's spinal cord was not damaged such that it constituted a barrier to his being able to do part time, sedentary work of a nature suited to his background. But there was no discounting of the obstacle of pain as a barrier which would have to be surmounted. A comprehensive many-faceted pain program involving psychology, therapy, pain management strategies, and reeducation was recommended. Only if this had some success was even a return to part time work envisaged. This, in my opinion, is not substantial evidence supporting Paul Revere's denial.

I would add two other pieces of evidence bearing on arbitrariness, or failure to act rationally. On March 27, 1991, the rehabilitation consultant Delahanty wrote Paul Revere about discussing with Doyle the possibility of pursuing the Center's recommendation of what he referred to as "therapeutic options, including work hardening." He reported Doyle's statement that his physician felt that he was "not a vocational rehabilitation candidate," and that "it would be necessary for him to further discuss with his physician the possibility of any therapeutic options...."

Notwithstanding this statement, the consultant made no recommendation to follow up the Center's suggestion or in any other way to address the pain problem. On the same day that Delahanty made his written report, Paul Revere wrote its letter denying Long Term Disability Benefits. There was no mention of discussing the details of a comprehensive pain program with Doyle's treating physician. It referred to the reports of both Dr. Cook and the Center as "support[ing] your ability to perform sedentary work," with no mention of a precondition that the pain barrier must first be surmounted.

I make one final observation. I recognize, as does the court in its footnote 4, that Social Security Administration awards of disability benefits based on an inability to engage in substantial gainful employment are not of binding effect on disability insurers. But, in Doyle's Social Security decision, the evidence of his "non-exertional limitations" (i.e., pain-related limitations) was found to trump what would otherwise be a capacity to engage in sedentary work. It was consistent with and supportive of my reading of the Cook and Center reports. Ignoring it in this case

seems to me another indication of arbitrariness.

If indeed the court's conclusion, affirming the denial of benefits, is commanded by law, an insurer may not only choose between doctors but may selectively read medical reports from the same doctors or evaluators, selecting those parts which support its action and ignoring those which do not. If this can be equated with "substantial evidence," I think that the administration of total disability policies is very substantially review-free.

I respectfully dissent.