**Nancy P. WADE, Plaintiff**

v.

**LIFE INSURANCE COMPANY OF NORTH AMERICA, Defendant**

**No. 02–CV–105–B–S.**

United States District Court, D. Maine.

June 3, 2003.

Jon Holder, Holder & Grover, ME, Portland, for Nancy P. Wade.

John J. Aromando, Mark E. Porada, Pierce, Atwood, Portland, ME, for Life Insurance Company of North America.

## ORDER REGARDING JUDGMENT ON THE ADMINISTRATIVE RECORD

SINGAL, Chief Judge.

A former participant in an employee benefit plan alleges that her long term disability insurer improperly terminated her coverage, in violation of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001–1461. Presently before the Court is Defendant's Motion for Judgment on the Administrative Record (Docket # 30). For the following reasons, the Court GRANTS Defendant's motion.

## I. FACTS

Plaintiff Nancy Wade was employed as a claim service assistant by State Farm Insurance Company ("State Farm"). State Farm maintained a group long term disability plan (the "Plan") for eligible employees. Wade was insured under a Group Long Term Disability Income Policy (the "Policy") issued by Defendant Life Insurance Company of North America ("LINA") to the Plan in 1997.

The Policy provides payment to employees in the event of disability. Under the Policy:

> An Employee will be considered Disabled if because of Injury or Sickness, he is unable to perform all essential duties of his occupation.[1]

> After Monthly Benefits have been payable for 24 months, an Employee will be considered Disabled only if he cannot actively work in any "substantially gainful occupation" for which he is qualified or may reasonably become qualified by reason of his education, training or experience.[2]

> "Substantially gainful occupation" means one which provides the income required to support the standard of living reasonably approximating the standard maintained prior to the disability.

(Decl. of Counsel at Ex. A (Docket # 15).) The Policy further defines "injury" as an "accidental bodily injury" and "sickness" as "a physical or mental illness." (Decl. of Counsel at Ex. A (Docket # 15).) The Summary Plan Description ("SPD") vests LINA with:

> the power to make all reasonable rules and regulations required in the administration of the Plan and for the conduct of its affairs, to make all determinations

---

**1.** Throughout the opinion, the Court refers to the inability to perform all essential duties of one's own occupation as the "own occupation" provision of the Policy.

**2.** The inability to work in any substantially gainful occupation after twenty-four months is referred to as the "any occupation" provision.

that the Plan requires for its administration, and to construe and interpret the Plan whenever necessary to carry out its intent and purpose and to facilitate its administration. (Decl. of Counsel at Ex. B (Docket # 15).) Any determinations, interpretations or constructions by LINA are "binding upon the Policyholder [and] all Employees . . . ." (Decl. of Counsel at Ex. A (Docket # 15).)

Early in 1996, Wade began complaining of pain in both hands and on January 22, 1997, stopped working after being diagnosed with Carpal Tunnel Syndrome ("CTS").[3] She submitted a claim for disability benefits to LINA on September 5, 1997. On November 12, 1997, LINA determined that Wade was disabled within the meaning of the "own occupation" prong of the Policy and approved the payment of long term disability benefits retroactive to July 21, 1997. However, on February 19, 2002, LINA denied Wade further disability benefits under the "any occupation" provision of the Policy. Wade presently disputes this determination.

### A. Benefits Determination Under the "Own Occupation" Provision

Although uncontested, LINA's initial disability determination forms part of the administrative record and informed LINA's subsequent eligibility determination under the "any occupation" prong of the Policy. Therefore, the Court recounts the relevant portions of the earlier record.

On September 5, 1997, State Farm submitted a disability claim to LINA on behalf of Wade. Included in the application for benefits was an initial employee questionnaire. Wade provided the names of her attending physician, Dr. John Archambault, M.D., and her orthopedic hand specialist, Dr. P. Gregory Askins, M.D., as well as brief descriptions of her treatments, medications and past work experience. Drs. Archambault and Askins also included physician's statements. Dr. Archambault diagnosed Wade's condition as bilateral CTS with pain, numbness and weakness in both wrists and hands. He indicated that Wade had limited functional capacity, but retained the ability to occasionally lift or carry no more than ten pounds. He further noted that Wade's pushing, pulling and climbing abilities were limited. In Dr. Archambault's opinion, Wade was not capable of performing her job with State Farm or any other occupation.

As part of its initial determination, LINA also requested that Dr. Archambault complete a Physical Ability Assessment ("PAA") and submit any medical records for Wade. Dr. Archambault's PAA again indicated that Wade experienced considerable pain and numbness in her wrists when using a computer and was therefore unable to work. His treatment notes from the preceding period largely concur with this assessment.

In his statement, Dr. Askins diagnosed Wade's condition as ongoing bilateral upper extremity limb pain and tenosynovitis.[4] Subjective symptoms, according to Dr. Askins, included numbness in the thumb, ring finger and little finger with discomfort along the outside of the palm. He indicated that Wade's restrictions included lifting or carrying no more than ten

---

**3.** Carpal Tunnel Syndrome is defined as a "symptom complex due to compression of the median nerve within the carpal tunnel, characterized by disturbances of sensation in the area of the skin supplied by the median nerve, pain on sharp flexion of the wrist, edema of the fingers, tense and shiny skin, and atrophy of the thenar muscles." *Gould Medical Dictionary,* 231 (Alfonso R. Gennaro, et al. eds., 4th ed.1979).

**4.** Tenosynovitis is "inflammation of a tendon and its sheath." *Gould Medical Dictionary,* 1356 (Alfonso R. Gennaro, et al. eds., 4th ed.1979).

pounds, standing or walking four to six hours per day and sitting four to six hours a day. Dr. Askins indicated that Wade could perform unlimited bending and stooping. Although Dr. Askins noted that Wade was not capable of performing her occupation, he did not address the question regarding Wade's ability to perform other occupations. Additionally, the Doctor remarked that Wade should avoid repetitive grasping and manipulation, sustained grasping and push/pull activities. He further noted that keyboarding and writing should be limited to less than ten minutes an hour. Dr. Askin's PAA, dated October 9, 1997, indicated largely the same limitations and restrictions as his earlier physician statement. The Doctor's treatment notes suggested similar restrictions.

Wade supplemented her application for benefits with a completed disability questionnaire on September 21, 1997. The form indicated that pain, numbness and weakness in both wrists due to CTS prevented Wade from continuing to work as a claim service assistant. She further wrote that she could not write or type for more than ten minutes per hour, could not lift anything over five to ten pounds, or bend her arms for an extended period of time. Wade was able to perform all of her own personal care functions, light cooking and cleaning, shopping and laundry with the assistance of her spouse. Wade indicated that due to her physical restrictions she did not anticipate returning to work in any capacity. The application also included a description of Wade's educational background and her entire work history.

LINA approved Wade's claim for long term disability benefits on November 12,

1997 retroactive to July 21, 1997. However, the approval letter cautioned that after the first twenty-four months of benefits, Wade "must be unable to engage in the essential duties of any occupation to qualify for [continued] benefits." (Aff. of Mark Porada at Attach. 360 (Docket # 31).)

**B. Benefits Determination Under the "Any Occupation" Provision**

After approving initial benefits, LINA received a completed "Estimated Functional Capacities Form" from Dr. Askins, dated November 6, 1997. The capacities form indicated that Wade could sit, stand or walk four hours over the course of an eight hour work day. Dr. Askins also noted that Wade could occasionally lift or carry up to ten pounds, push and pull objects and reach above shoulder height. Although Wade could not perform repetitive grasping or gripping actions, she could employ her hands for fine manipulation. Again, Dr. Askins limited keyboarding to ten minutes per hour.

Dr. Askins subsequently reaffirmed Wade's capacities in a May 5, 1998 supplemental form.[5] Using the restrictions suggested by Dr. Askins, LINA commissioned a transferable skills analysis ("TSA") to determine whether Wade's disability permitted work in any other occupation. This was the first of five such TSAs commissioned by LINA. Although the vocational assessment, dated June 6, 1998, determined that three jobs consistent with Wade's education and work history fell within her medical restrictions, none of the positions offered comparable earnings.

On December 12, 1998, Dr. Archambault submitted a supplemental claim form indi-

---

5. The administrative record, as provided to the Court, appears to include only the first page of the May 5, 1998 supplemental form. (*See* Aff. of Mark Porada at Attach. 334 (Docket # 31).) However, the single page indicates that Wade's progress was un-

changed on May 5. Furthermore, the record subsequently confirms that the remaining contents are consistent with the November 6, 1997 capacity form. (*See* Aff. of Mark Porada at Attach. 9, 19 (Docket # 31).)

cating that Wade's diagnosis was still bilateral CTS. Dr. Archambault's objective findings included positive Tinel's and Phalen's signs as well as grip weakness in both wrists.[6] He further noted that Wade had severely limited functional capacity and was incapable of even minimal activity. The Doctor indicated that Wade was not a candidate for further rehabilitation or vocational counseling and retraining.

By letter dated March 9, 1999, LINA provided Wade with notice that after the passage of twenty-four months, she would no longer be considered disabled under the Policy if she could work in any substantially gainful occupation. LINA requested that Wade complete another disability questionnaire to facilitate the new determination Similarly, the insurer requested that Dr. Archambault submit a "comprehensive medical narrative report," an additional PAA and a complete copy of his records dating from March 1, 1998.

Wade's response on March 16 echoed earlier questionnaires. Wade indicated that she cooked and cleaned in limited capacities daily as well as shopped and did the laundry with the aid of her husband. Wade noted that she attended therapy twice a week at her doctor's instruction. Additionally, she stated that she was not interested in retraining for another occupation, that she did not anticipate returning to work soon and that persistent symptoms and prior failed efforts at treatment prevented her from engaging in any gainful employment.

On March 12, Dr. Archambault forwarded another PAA to LINA, indicating significantly increased restrictions for Wade. Dr. Archambault reported that Wade could only sit, stand or walk for one hour a day. He further stated that Wade could never perform any lifting or carrying, pushing or pulling, reaching, simple grasping, keyboarding or fine manipulation. Similarly, Wade was never to be exposed to extreme heat or cold, wet or humid condition or vibrations. In response, LINA wrote to Dr. Archambault on May 26, 1999 to inquire whether Wade had been diagnosed with another condition that accounted for the increased restrictions. The insurer again requested copies of Dr. Archambault's office notes.

On June 23, 1999, Dr. Archambault replied in narrative form. He wrote that Wade continued to suffer from bilateral CTS and that her work restrictions remained unchanged. The Doctor indicated that she should avoid repetitive and sustained grasping activities, work in cold environments and use of vibratory tools. Along with the June 23 letter, he provided the requested treatment notes from the previous year. The notes primarily addressed health problems unrelated to Wade's CTS. On April 3, and June 22, 1998, however, Dr. Archambault saw Wade for her CTS and reaffirmed his earlier assessments of Wade's condition.

After receiving Dr. Archambault's June 23 letter, LINA requested a second TSA for Wade. Based on the health restrictions imposed in the letter, the analysis searched for sedentary to light positions requiring only occasional handling, grasping and fine manipulation that did not entail exposure to the cold or vibrations.[7]

---

**6.** Tinel's test indicates CTS if tapping on the median nerve causes tingling in the thumb and fingers. The Phalen, or wrist flexion, test indicates CTS where pressing the backs of the hands together results in tingling or increasing numbness within one minute. National Institutes of Health, *Carpal Tunnel Syndrome Fact Sheet* (November 1, 2002), *at*

http://www.ninds.nih.gov/health_and_medical/pubs/carpal_tunnel.htm.

**7.** The Court notes that the TSA restrictions appear somewhat inconsistent with the March 12, 1999 restrictions provided by Dr. Archambault. It is possible that LINA overlooked Dr. Archambault's statement in the June 23, 1999

Although the vocational assessment, dated July 13, 1999, determined that Wade's education and work history were compatible with five potential occupations, all of the positions failed to meet Wade's earning requirements. Consequently, on July 14 LINA determined that Wade was unable to perform any occupation within the meaning of the Policy and approved continuing long term disability benefits. In accordance with the Policy, LINA reserved the right to periodically request proof of continuing disability under the "any occupation" prong.

As foreshadowed in the 1999 approval of benefits, LINA re-commenced its review of Wade's claim on April 19, 2001 after outside auditors uncovered a potential oversight in Wade's earlier TSAs. The insurer requested that Wade complete another disability questionnaire. She responded on May 5, 2001 that she continued to suffer from bilateral CTS and that she was now seeing only Dr. Archambault for the condition. Because she was restricted to no more than ten minutes of repetitive hand motion per hour and past treatments had failed to address her condition, Wade maintained that she was prevented from engaging in any gainful employment. Similarly, she indicated that she did not anticipate returning to work in the near future due to continuing pain, weakness and tingling in both wrists on a daily basis. Wade again described that she performed light cooking and cleaning on her own and shopping and laundry with the help of her husband.

In light of the auditor's findings, LINA commissioned another TSA for Wade and requested that the analysis be sure to account for her complete work history. Relying on the same sedentary to light restrictions culled from Dr. Archambault's June 23, 1999 letter, the third TSA, dated August 31, 2001, identified five occupations that were compatible with Wade's skills, education and physical ability as well as her earnings requirements. However, LINA subsequently received more conflicting evidence of Wade's physical abilities. Dr. Archambault's office sent typed questionnaire responses incorporated within a form provided by State Farm's medical director and dated August 23, 2001.[8] The August 23 responses indicated that Wade could carry or lift five to eight pounds and perform minimal pushing and pulling. Wade was prohibited from keyboarding as well as vacuuming due to the vibrations. The questionnaire indicated that she could take on moderate cooking and cleaning because she "cannot lift more than 15 lbs." (Aff. of Mark Porada at Attach. 169 (Docket # 31).) Wade's return to the workforce remained doubtful in light of her condition. Incorporating the new restrictions, a fourth TSA on September 25, 2001 found that only one occupation, Customer Complaint Clerk, was compatible with Wade's abilities, background and earning requirements.

In the interim, LINA case manager Nancy Ippolito telephoned Wade on September 19, 2001. When asked what her daily activities entailed, Wade responded

---

letter that "the work restrictions on this patient remain unchanged" from the March 12 PAA. (Aff. of Mark Porada at Attach. 217 (Docket # 31).) However, the record indicates that LINA considered these occupational parameters to be consistent with the June 23 Archambault restrictions. (*See* Aff. of Mark Porada at Attach. 196 (Docket # 31).) In any event, the discrepancy is immaterial given the ultimate conclusion of the TSA.

8. It is unclear from the record whether Dr. Archambault or Albert Shems, M.D., a temporary physician filling-in after Dr. Archambault's retirement for health reasons, completed the questionnaire. Consistent with an October 3, 2001 letter from the medical director of Dr. Archambault's office, however, the Court assumes that the responses were authored by Dr. Shems.

that she does some cleaning and cooking as well as vacuuming once a week but does not "over do" anything. The recurrence of pain and swelling after each attempted return to work in the past prevented Wade from rejoining the workforce at that time. She also noted that she might consider returning to work if LINA could identify suitable occupations within her physical limitations. LINA then requested a fifth TSA, this time incorporating the physical limitations mentioned by Wade in the May 5, 2001 disability questionnaire. Assuming an ability to perform repetitive motion for no more than ten minutes per hour, the occupational consultant identified five compatible positions on September 26, 2001.

LINA noted a number of conflicts within Wade's various limitations and restrictions during this period. Wade indicated she was capable of typing for ten minutes per hour as well as household vacuuming on May 5, but the August 23 treating physician's statement prohibited both activities. Additionally, the five to eight pound weight restrictions imposed in the August 23 statement conflicted with Dr. Archambault's earlier June 23, 1999 letter. The August 23 statement also appeared to limit lifting and carrying to both five to eight pounds and up to fifteen pounds. Due to these inconsistencies, case manager Ippolito requested that Donna Simmons, R.N., conduct a review of Wade's claim. Ippolito noted that "[i]t appears that the [claimant] may be able to do more than is indicated by her doctor." (Aff. of Mark Porada at Attach. 139 (Docket # 31).) On October 2, 2001, Nurse Simmons contacted Dr. Archambault's office and requested all office notes, records and test results for Wade dating from January 2000 in addition to completion of another PAA. In particular, Nurse Simmons inquired as to: (1) Wade's lifting/carrying capabilities; (2) whether Wade's May 5 limitation of ten minutes of repetitive motion per hour or the August 23 limitation prohibiting all keyboarding was accurate; and (3) whether Wade was capable of vacuuming.

Hans Duvefelt, M.D., medical director of Dr. Archambault's office, responded by letter on October 3, 2001. Dr. Duvefelt explained that a temporary physician, Albert Shems, M.D., had briefly seen Wade on September 6 during Dr. Archambault's absence and had completed the August 23 statement. Dr. Duvefelt opined that, based on the available notes, Wade's condition remained essentially unchanged and thus small discrepancies in limitations, such as those noted by LINA, are explained by subjective differences on the part of the two treating physicians. According to Dr. Duvefelt, any inconsistency between the limitations imposed by Drs. Archambault and Shems did not provide grounds "to assume that Dr. Shems felt differently about [Wade's] situation based on his very brief notes." (Aff. of Mark Porada at Attach. 142 (Docket # 31).) Dr. Duvefelt did not complete the PAA or forward the requested records.

In a continuing effort to establish Wade's physical capabilities, Nurse Simmons referred Wade to an independent facility for a one-day functional capacity evaluation ("FCE") of her upper extremities. However, because the nearest facility capable of performing the evaluation was approximately four hundred miles from Wade's home, Simmons instead re-requested the medical records on October 26, 2001. Case manager Ippolito subsequently wrote to Wade on November 5, 2001 and noted that her treating physician had failed to respond to earlier requests for necessary documentation. The letter stated that "sufficient clinical information to support ongoing restrictions and limitations" was necessary to establish her continuing eligibility for benefits and imposed a November 19 deadline for submission of

the required material. (Aff. of Mark Porada at Attach. 121 (Docket # 31).)

On November 16 Wade's husband provided LINA with an attending physician's statement completed by Dr. Archambault on behalf of State Farm. The June 14, 2001 statement described continuing numbness in the fingers of both hands and grip weakness. Dr. Archambault noted positive Tinel's and Phelan's signs and indicated that he was seeing Wade for CTS every two to three months. Wade was unable to work indefinitely.[9] When asked on November 29 why LINA had not yet scheduled an FCE, case manager Ippolito informed Wade that the evaluation is "not needed, we do not have sufficient documentation to support [your] disability." (Aff. of Mark Porada at Attach. 81 (Docket # 31).)

Ultimately, Beth–Ann Lieberman, D.O., contacted LINA and made arrangements for providing the requested documentation and responding to the insurer's questions. By letter dated December 12, 2001, Dr. Lieberman explained that she was new to the practice and was replacing Dr. Archambault. As such, her responses to the questions posed in the October 2 correspondence were taken directly from Wade's file. Dr. Lieberman reiterated the five to eight pound carrying and lifting limits.[10] Similarly, she endorsed the limitation of no repetitive hand movements of any type, drawing in part on the conclusions of an independent examiner em-

ployed during Wade's Social Security hearing. Dr. Lieberman further stated that Wade should avoid the use of vibratory tools, including vacuums.

Dr. Lieberman also forwarded the treatment notes requested by LINA. The notes largely indicate that Dr. Archambault considered Wade's diagnosis and limitations to be unchanged. Dr. Archambault noted positive Tinel's and Phalen's signs on May 12, 2000. He indicated continuing tingling and numbness in both hands within ten to fifteen seconds of hyperextension on December 11, 2000. The Doctor further noted finger numbness following palmar flexion and assessed continuing CTS during that visit. Similarly, on June 14, 2001, he noted an on-going assessment of bilateral CTS and reaffirmed earlier limitations. However, Dr. Archambault also indicated on April 23, 2001 that Wade had been "lifting wood to bring into the stove and lifting objects as well" in relation to an arm muscle strain. (Aff. of Mark Porada at Attach. 87 (Docket # 31).) Although acknowledging that Dr. Lieberman had answered LINA's questions, case manager Ippolito subsequently stated that "we are still lacking clinical documentation to support the [claimant's] limitations." (Aff. of Mark Porada at Attach. 49 (Docket # 31).)

On December 19, 2001, LINA commissioned Daniel A. Nackley, M.D., to conduct a review of Wade's claim. After reviewing her file, Dr. Nackley determined on Janu-

---

**9.** During this period, Wade also informed LINA that she was suffering from spondylosis that made it difficult for her to sit for long periods. Spondylosis is stiffness or fixation of the vertebral joints. *Gould Medical Dictionary*, 82, 1282 (Alfonso R. Gennaro, et al. eds., 4th ed.1979).

**10.** Dr. Lieberman cites to "a letter from Dr. Archambault dated 12/23/00 to State Farm Insurance" for this proposition as well as those that follow. (Aff. of Mark Porada at

Attach. 106 (Docket # 31).) Given the exact congruity of her statements with those set out in the August 23, 2001 letter, the Court assumes that Dr. Lieberman intended to cite the later document. However, even assuming that Dr. Lieberman draws from a document not contained within the administrative record, the Court's analysis is unchanged because the limitations adopted by her precisely mirror the limitations laid out in the August 23 document.

ary 24, 2002 that "objective clinical findings have not indicated carpal tunnel syndrome; however, the claimant carries that diagnosis." (Aff. of Mark Porada at Attach. 48 (Docket # 31).) Dr. Nackley opined that Wade does appear to have "functionality" sufficient to meet the needs of some occupations. He noted that the ability to lift and carry five to eight pounds permitted work requiring "sedentary exertional levels." (Aff. of Mark Porada at Attach. 48 (Docket # 31).) LINA also asked Dr. Nackley whether any tests other than the upper extremity FCE would be helpful in determining Wade's physical capabilities and limitations. He responded that an evaluation by an occupational therapist would suffice to establish Wade's upper extremity limitations.

However, case manager Ippolito noted that "[b]ased on Dr. Nackley's review there does not appear to be adequate documentation to support disability. It appears that Dr. Nackley is suggesting an exam because her doctor is stating disability even though documentation does not support disability." (Aff. of Mark Porada at Attach. 42 (Docket # 31).) Given the absence of supporting documentation, LINA declined to send Wade to an occupational therapist and instead opted to have Dr. Nackley contact Wade's physician directly. LINA provided Dr. Nackley with the five sedentary job descriptions generated by the September 26, 2001 TSA to inform any discussion of Wade's functional capabilities. LINA included descriptions of Customer–Complaint Clerk, Information Clerk, Call–Out Operator, Tourist–Information Assistant and Space Scheduler positions. However, the Information Clerk position was later determined to not meet Wade's earning requirements.

Dr. Nackley reported on his discussions with Wade's physicians on February 1, 2002. He first noted that the five seden-

tary positions identified in the earlier TSA required only occasional finger movement and that Wade retained functionality with regard to the positions. The report then relayed that Dr. Lieberman considered Wade's limitations to have remained unchanged from the time of her December 12 letter. Upon learning from Dr. Lieberman that Wade had recently visited Dr. Askins on January 24, Dr. Nackley contacted Dr. Askins as well. Dr. Askins informed him that Wade's limitations remained unchanged since his May 5, 1998 supplemental disability form. At that time, Dr. Askins considered Wade capable of light duty work. She was to avoid repetitive or sustained grasping activities, use of vibratory tools and cold environments and keyboarding for greater than ten minutes an hour. Finally, Dr. Nackley noted that the occupational titles provided by the earlier TSA fell within these limitations.

On February 19, 2002 LINA terminated Wade's disability benefits. Pointing to the four positions identified in the TSA, case manager Ippolito informed Wade that:

> While we understand that you have limitations, Dr. Askins has identified a level at which you are capable of performing. The occupations that we identified are consistent with the limitations imposed by Dr. Askins. Based on the documentation we have received from your physicians we have determined that you are capable of performing other occupations. Therefore you no longer qualify for Long Term Disability benefits.

(Aff. of Mark Porada at Attach. 19 (Docket # 31).) LINA also notified Wade of her right to appeal its determination within one hundred and eighty days. Wade appealed pursuant to a letter from counsel dated April 4, 2002. The appeal was subsequently denied due to a failure to submit additional documentation of Wade's disability.[11]

---

**11.** The Court notes that Defendant has pro- vided no materials regarding Wade's appeal

## II. DISCUSSION

The parties do not contest that the Plan in the present case is an "employee benefit plan" within the ambit of ERISA. 29 U.S.C. §§ 1002(3), 1003(a) (1999). ERISA provides that a participant may bring a civil action "to recover benefits due to him under the terms of his plan [or] to enforce his rights under the terms of the plan . . . ." 29 U.S.C. § 1132(a)(1)(B) (1999). "[A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). If a plan imparts such discretionary authority to the administrator or fiduciary, *Firestone* requires that the challenge be reviewed under a deferential arbitrary and capricious standard. *Leahy v. Raytheon Co.,* 315 F.3d 11, 15 (1st Cir.2002) (quoting *Recupero v. New Eng. Tel. & Tel. Co.,* 118 F.3d 820, 827 (1st Cir.1997)). Because Plaintiff challenges Defendant's February 19, 2002 termination of benefits pursuant to section 1132, the Court must first examine the Plan language to determine the appropriate standard of review before addressing the substance of Plaintiff's claims.[12]

### A. Standard of Review

■ Defendant asserts that the SPD allows it sufficient discretionary authority to warrant the application of the arbitrary and capricious standard in this case. Plaintiff argues that the SPD, standing alone, is insufficient to confer the necessary discretion on Defendant without some additional grant of authority in the Policy. She further maintains that ambiguities arising from inconsistencies between the SPD and Policy should be construed against Defendant, or, alternatively, that the relevant language in the SPD is insufficient to make the deferential standard appropriate. The disputed SPD language states that both the Plan administrator and LINA retain "the power . . . to make all determinations that the Plan requires for its administration, and to construe and interpret the Plan whenever necessary to carry out its intent and purposes and to facilitate its administration." (Decl. of Counsel at Ex. B (Docket # 15).)

Courts have consistently found this same language to confer sufficient discretionary authority to trigger the arbitrary and capricious standard. *See DeWitt v. State Farm Ins. Cos. Retirement Plan for United States Employees,* 905 F.2d 798, 801 (4th Cir.1990); *Oslowski v. Life Ins. Co. of N. Am.,* 139 F.Supp.2d 668, 676 (W.D.Pa.2001). LINA's power to "make all determinations" necessary for administration of the Plan, including eligibility determinations, as well as its authority to construe the terms of the Plan evidence precisely the degree of discretion required under *Firestone. Firestone,* 489 U.S. at 115, 109 S.Ct. 948; *Terry v. Bayer Corp.,* 145 F.3d 28, 37 (1st Cir.1998). The location of the relevant language within the

other than to aver that the process was compliant with ERISA regulations. As Plaintiff has not objected to this omission from the administrative record, the Court does not address the absence of appellate materials.

**12.** Although it is unclear from the record whether Defendant LINA represents a Plan administrator, the authority conferred on LINA by the Plan documents makes the in-surer a fiduciary within the meaning of ERISA. 29 U.S.C. § 1002(21)(A) (1999). As a fiduciary, Defendant is subject to liability under section 1132 and its benefits determinations implicate the standard of review analysis announced in *Firestone.* 29 U.S.C. § 1132(a)(1)(B) (1999); *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989).

SPD rather than the Policy does not change this conclusion. *See Sidou v. Unumprovident Corp.*, 245 F.Supp.2d 207, 218–19 (D.Me.2003) (concluding that language in the SPD forms part of the "Plan" for purposes of the *Firestone* analysis); *see also Oslowski*, 139 F.Supp.2d at 676 (finding discretionary authority on basis of SPD language).

Moreover, the alleged inconsistencies between the Policy and SPD do not give rise to any ambiguities regarding the discretion granted in the SPD. The SPD states on its terms that that the Policy shall govern any disagreements between the two documents. However, in the instant case the documents do not disagree. Rather, the Policy does not include any mention of the grant of discretionary authority to LINA clearly provided for in the SPD. This omission does not rise to the level of an ambiguity to be construed against Defendant. *See Sidou*, 245 F.Supp.2d at 218–19 (applying discretionary language located within the SPD where "plan master documents do not provide for the delegation of final decision-making authority"); *see also Chiles v. Ceridian Corp.*, 95 F.3d 1505, 1515 (10th Cir. 1996) ("Because the SPD best reflects the expectations of the parties to the plan, the terms of the SPD control the terms of the plan itself."); *Mauser v. Raytheon Co. Pension Plan for Salaried Employees*, 31 F.Supp.2d 168, 173–174 (D.Mass.1998) (finding that the SPD controls in the event of a conflict with the plan even where the SPD disclaimed that the plan controls in the event of such an inconsistency). Given Defendant's discretion to determine eligibility under the terms of the Plan, the Court applies the arbitrary and capricious standard of review in the instant case.

Under this deferential standard, a termination of benefits must be upheld unless the decision was "arbitrary, capricious, or an abuse of discretion." *Doyle v. Paul Revere Life Ins. Co.*, 144 F.3d 181, 183 (1st Cir.1998); *see also Pari–Fasano v. ITT Hartford Life & Accident Ins. Co.*, 230 F.3d 415, 419 (1st Cir.2000) (noting the functional equivalence of the abuse of discretion and arbitrary and capricious standards). Reasoned denials of benefits that are supported by substantial evidence will survive review under the standard. *Doyle*, 144 F.3d at 184. Substantial evidence exists where the evidence is reasonably sufficient to support the decision. *Id.* The mere existence of accompanying contradictory evidence does not defeat a sufficiency determination. *Vlass v. Raytheon Employees Disability Trust*, 244 F.3d 27, 32 (1st Cir.2001); *Doyle*, 144 F.3d at 184. However, the existence of a conflict of interest must be considered when determining whether an insurer has abused its discretionary authority. *Firestone*, 489 U.S. at 115, 109 S.Ct. 948; *Doe v. Travelers Ins. Co.*, 167 F.3d 53, 57 (1st Cir.1999).

When applying the arbitrary and capricious standard, the Court must determine whether the insurer's "eligibility determination was unreasonable in light of the information available to it." *Pari–Fasano*, 230 F.3d at 419. The record "consists of that evidence that was before the administrator when he made the decision being reviewed." *Cook v. Liberty Life Assurance Co.*, 320 F.3d 11, 19 (1st Cir. 2003) (quoting *Mitchell v. Eastman Kodak Co.*, 113 F.3d 433, 440 (3d Cir.1997)). The Court, therefore, must ascertain "whether the aggregate evidence, viewed in the light most favorable to the non-moving party, could support a rational determination that the [insurer] acted arbitrarily in denying the claim for benefits." [13] *Brigham v. Sun*

---

13. Plaintiff asserts that application of the deferential standard would violate her right to due process by prohibiting meaningful access to the Court otherwise afforded to any "civil litigant whose access is not limited by a specific statutory or constitutional command." (Pl.'s Resp. and Objection at 3 (Docket # 34).)

*Life of Can.,* 317 F.3d 72, 82 (1st Cir.2003) (quoting *Leahy,* 315 F.3d at 17); *see also Cook,* 320 F.3d at 19 n. 8 (noting that there is no conflict between the summary judgment standard and degree of deference owed to plan fiduciaries).

### B. Termination of Benefits

Plaintiff makes a number of arguments that even under the arbitrary and capricious standard, Defendant's termination of benefits should be overturned. She first argues that Defendant's financial interest in the outcome of the benefits determination represents an abuse of discretion, warranting remand of Defendant's decision. Plaintiff next asserts that Defendant's determination was arbitrary and capricious because LINA unreasonably manipulated the available evidence to support its termination of benefits. Finally, she maintains that procedural defects in Defendant's appeal process denied her a full and fair hearing, thereby running afoul of the arbitrary and capricious standard. The Court addresses each argument in turn.

### 1. Conflict of Interest

Plaintiff maintains that "there is a serious conflict of interest that may alter the outcome of the review [of benefits] by causing [Defendant] to pay more attention to its financial interests than to those of its insureds." (Plt.'s Resp. at 2

(Docket # 34).) However, Defendant's financial stake in the outcome of the benefits determination does not defeat its decision under these facts. A mere showing that an insurer decides which claims it will pay is insufficient, standing alone, to establish an improper motive. *See Leahy,* 315 F.3d 11, 16 (finding no meaningful conflict where market forces and the structure of a voluntary employee-funded plan discouraged biased claims handling); *Pari–Fasano,* 230 F.3d at 418 (noting that "the market presents competing incentives to the insurer that substantially minimize the apparent conflict"); *Doyle,* 144 F.3d at 184 (suggesting that the competing interest of retaining customers operates to check an insurer's financial interest in the outcome of a benefits determination). Because there is no other evidence that Defendant's determination was improperly motivated by a conflict of interest, the Court finds that no abuse of discretion resulted from Defendant's financial stake in Plaintiff's claim. *Doyle,* 144 F.3d at 184.

### 2. Evidence in the Record

Plaintiff argues that she is in fact disabled under the terms of the policy and that Defendant unreasonably manipulated the evidence available to it in order to deny her benefits. In particular, she maintains that although no doctor felt that Plaintiff could work, Defendant failed to pursue necessary objective test-

---

In the instant case, however, the Court's role is limited by a specific *contractual* command. As discussed above, the Plan unambiguously reserves to LINA, rather than the courts, discretion to interpret the terms of the Plan. As such, any narrowing of Plaintiff's access to the judiciary was noticed in the SPD and agreed to by Plaintiff. *See Chiles v. Ceridian Corp.,* 95 F.3d 1505, 1515 (10th Cir.1996) (applying principles of contract interpretation to plan documents and noting that the SPD best reflects the expectations of the parties). Similarly, Plaintiff further asserts that deferential review would deny her access to the

federal courts in violation of Title II of the Americans with Disabilities Act (ADA). *See* 42 U.S.C. § 12132 (1995). Given Plaintiff's failure to raise the ADA issue in any meaningful way other than a brief and undeveloped footnote found within a responsive pleading, the Court declines to reach the substance of any Title II arguments available in this case. Moreover, it is unclear whether Plaintiff's allegation of wrongdoing is leveled at Defendant or at the Court for applying the deferential standard.

ing and performed repeated vocational assessments until the desired results were obtained. Plaintiff also asserts that her eligibility for Social Security benefits underscores the speculative inferences relied upon by Defendant. In response, Defendant does not contest Plaintiff's CTS diagnosis, only her asserted physical capabilities.

Plaintiff's physical capabilities dictate her ability to "actively work in any 'substantially gainful occupation'" under the terms of the Policy. Thus, the instant dispute turns on whether the work limitations and restrictions ultimately adopted by Defendant were reasonably supported by substantial evidence within the administrative record. The Court therefore addresses each of Plaintiff's objections in turn while focusing its analysis upon Plaintiff's physical capabilities.

### a. Plaintiff's Physical Capabilities

The record does not bear out Plaintiff's assertion that no doctor felt she could work. Rather, only Dr. Archambault's March 12, 1999 PAA and subsequent June 23, 1999 letter pronounced a blanket prohibition on all lifting, carrying, grasping, keyboarding or fine manipulation. Indeed, Defendant first approved continuing long term disability benefits under the "any occupation" provision largely in reliance on Dr. Archambault's blanket prohibition. However, subsequent reports of Plaintiff's physical restrictions and limitations as well her own descriptions of her daily activities uniformly indicate that Plaintiff was capable of some degree of hand and wrist activity.

 Throughout the claims review process and as late as January 2002, Dr. Askins consistently maintained that Plaintiff could occasionally lift or carry up to ten pounds, employ her hands for fine manipulation as well as keyboard for up to ten minutes an hour. Additionally, after Defendant recommenced its review of benefits in April 2001, both Plaintiff's own assessment of her limitations and that of her treating physician began to vary from the March 9, 1999 assessment. On May 5, 2001, Plaintiff indicated she was capable of typing for ten minutes per hour. Dr. Shems' August 23, 2001 responses indicated that Plaintiff could lift or carry at least five to ten pounds and perhaps up to fifteen pounds, while prohibiting Plaintiff from keyboarding or vacuuming. These restrictions were reaffirmed by Dr. Archambault's successor, Dr. Lieberman, on December 12, 2001 and again in January 2002 after Dr. Lieberman had treated Plaintiff. However, on September 19, 2001 Plaintiff reported that she vacuums once a week and on April 23, 2001 she complained to Dr. Archambault that she had injured herself lifting firewood. Therefore, even assuming the continuing validity of Dr. Archambault's March 9, 1999 restrictions, the record contains sufficient contradictory evidence to support competing inferences regarding Plaintiff's physical capabilities. Plausible decisions based on reasoned inferences from conflicting evidence do not rise to the level of arbitrary and capricious behavior. *Leahy,* 315 F.3d at 18–19; *Vlass,* 244 F.3d at 32.

### b. Repeated TSAs

Plaintiff's contention that Defendant arbitrarily manipulated the claims review process by repeatedly requesting TSAs is similarly without merit. Although the mixed results obtained from the TSAs do raise some questions regarding selective application of medical restrictions, Defendant's final decision rested on Dr. Nackley's review rather than the vocational assessments. Dr. Nackley confirmed that the various job descriptions deemed consistent with Plaintiff's education, experience and wage requirements were also compatible with her physical abilities as

determined during his own assessment of Plaintiff's file. He concluded in his first review that Plaintiff had functionality sufficient to perform occupations requiring "sedentary exertional levels." Dr. Nackley then affirmed Plaintiff's functionality by speaking directly with Drs. Lieberman and Askins. He determined that the positions of Customer–Complaint Clerk, Call–Out Operator, Tourist–Information Assistant and Space Scheduler demanded only sedentary exertion and fell within Plaintiff's abilities. Accordingly, Defendant's disability determination was supported by substantial evidence reasonably sufficient to support the decision. *See Doyle,* 144 F.3d at 186 (finding substantial evidence where insurer relied upon vocational assessments by rehabilitation consultant and occupational therapists); *see also Brigham,* 317 F.3d at 84 (noting that TSA based on specific abilities listed in treating physician's assessment contributed to reasonableness of termination of benefits); *Vlass,* 244 F.3d at 31 (crediting independent vocational assessment relied upon by insurer to deny benefits).

### c. Failure to Pursue Objective Testing

Moreover, Defendant's failure to pursue certain diagnostic testing does not implicate the arbitrary and capricious standard. The great distance between the necessary diagnostic equipment and Plaintiff's home dictated Defendant's decision not to perform an upper extremity FCE. Although Defendant did not refer Plaintiff to an occupational therapist as Dr. Nackley suggested, the insurer instead directed Dr. Nackley to contact Plaintiff's treating physicians directly. Dr. Nackley then considered both Dr. Lieberman's and Dr. Askins' assessments of Plaintiff's capabilities when making his final recommendations. De-

fendant drew on the sources most familiar with Plaintiff's physical limitations and restrictions when determining her capabilities and, thus, had no obligation to pursue an independent medical evaluation of its own. *Brigham,* 317 F.3d at 85 (finding that insurer had no obligation to obtain an independent medical evaluation where it accepted limitations offered by plaintiff's treating physician). Accordingly, Defendant's testing decisions reflect a reasoned investigation of Plaintiff's physical limitations and restrictions supported by significant medical evidence.

### d. Social Security Award

██ Plaintiff also points to the award of Social Security disability benefits in this case to support her position. On September 9, 1998, Plaintiff received a notice of award from the Social Security Administration. The Administration found that she became totally disabled on January 22, 1997 and that she was entitled to benefits as of July, 1997.[14] Defendant had supplied Plaintiff with an attorney to appeal an initial adverse decision by the Administration and subsequently offset its long term disability payments to Plaintiff by the award. Plaintiff now argues under *Ladd v. ITT Corp.,* 148 F.3d 753, 756 (7th Cir. 1998), that Defendant should be estopped from reversing its position regarding Plaintiff's disability after facilitating her efforts to establish disability before the Social Security Administration.

██ Here, the Social Security disability determination was made in August of 1998, while Defendant based its denial of benefits on medical information obtained during the period from May 2001 through January 2002. The changes that occurred in Plaintiff's limitations and restrictions

---

**14.** Disability for the purposes of a Social Security benefits determination is an "inability to engage in any substantial gainful activity." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A) (Supp. 2002).

during the intervening period formed the basis of Defendant's decision to terminate benefits. Thus, the Social Security determination does not dictate the outcome in this case. *See Pari–Fasano,* 230 F.3d at 420 (finding social security litigation "uninformative" where plaintiff's insurer discontinued benefits in 1996 and the Social Security Administration awarded benefits in 1992). Moreover, First Circuit precedent provides that "benefits eligibility determinations by the Social Security Administration are not binding on disability insurers." [15] *Pari–Fasano,* 230 F.3d at 420 (citing *Doyle,* 144 F.3d at 186 n. 4). As such, the Court finds that Defendant's decision to terminate Plaintiff's long term disability benefits was supported by substantial evidence. The facts in the administrative record do not sustain a finding that Defendant acted in an arbitrary or capricious manner.

### 3. Procedural Defects

Plaintiff makes two additional arguments regarding alleged regulatory failings in Defendant's appeal procedures. She first asserts that Defendant's failure to provide a requested claims manual must be deemed arbitrary and capricious because it indicates an absence of reasonable claims procedures. 29 C.F.R. § 2560.503–1(h)(2)(ii) (2001). Plaintiff then argues that the same individual, case manager Ippolito, conducted both her initial adverse benefits determination and her appeal, again in contravention of ERISA regulations.[16] 29 C.F.R. § 2560.503–1(h)(4) (2001).

However, the regulatory provisions invoked by Plaintiff do not apply to claims filed before January 1, 2002. 29 C.F.R. §§ 2560.503–1(e), 2560.503–1(o) (2001). Rather, Plaintiff's case is controlled by the regulations in effect when she filed her claim in 1997. *Bond v. Twin Cities Carpenters Pension Fund,* 307 F.3d 704, 706 (8th Cir.2002); *Skretvedt v. E.I. Dupont de Nemours & Co.,* 268 F.3d 167, 175–76 (3d Cir.2001). Under the 1997 regulations, there is no requirement that the appellate decision-maker differ from the initial decision-maker, although Defendant must permit Plaintiff to "[r]eview pertinent documents." 29 C.F.R. §§ 2560.503–1(g), 2560.503–1(h) (1997). Consequently, any review of Plaintiff's initial claim and subsequent appeal by the same individual does not reflect on the reasonableness of Defendant's appeal procedures. *See Skretvedt,* 268 F.3d at 175.

As regards Defendant's failure to produce the claims manual, the Court first notes that Plaintiff has not raised the claim either in her complaint or at any point during the discovery process. Even assuming the issue was properly raised,

---

**15.** Similarly, the Seventh Circuit noted that the insurer's proactive role in establishing disability for the purposes of Social Security benefits in *Ladd* was simply an additional factor weighing in favor of abuse of discretion. *Ladd v. ITT Corp.,* 148 F.3d 753, 756 (7th Cir.1998) ("This sequence casts additional doubt on the adequacy of their evaluation of Ladd's claim, even if it does not provide an independent basis for rejecting that evaluation.").

**16.** Such procedural defects are generally alleged as part of a "full and fair review" claim under 29 U.S.C. § 1133(2) (1999) or a request for damages under 29 U.S.C. § 1132(c)(1) (1999). Because the Court has already determined in its February 4, 2003 order that Plaintiff had a full and fair review and Plaintiff has not alleged a violation of section 1132(c), the Court does not address any potential cause of action under those provisions. Rather, the present discussion is limited to evidence of arbitrary or capricious behavior on the part of Defendant. *See Weaver v. Phoenix Home Life Mut. Ins. Co.,* 990 F.2d 154, 158–59 (4th Cir.1993) (considering compliance with ERISA regulations under the arbitrary and capricious standard).

however, substantial compliance with procedural requirements is sufficient to survive district court review. *Terry,* 145 F.3d at 39 ("Not all procedural defects . . . will upset a fiduciary's decision. Substantial compliance with the regulations is sufficient.") (quoting with approval *Donato v. Metro. Life Ins. Co.,* 19 F.3d 375, 382 (7th Cir.1994)). The contested manual is not part of the SPD or other Plan documents central to Plaintiff's appeal. Rather, the manual is peripheral to any interpretation of the Plan. *See Doe,* 167 F.3d at 60 (holding that insurer was not obligated to produce mental health guidelines where plaintiff had no legal rights under the document and the guidelines were one among many consultative materials available). Moreover, the record contains no indications that the manual actually influenced Defendant's decision-making and thereby prejudiced Plaintiff's appeal. *See Recupero,* 118 F.3d at 840 (finding that defective notice of benefits termination was insufficient to make a claim for relief without a showing that proper notice would have produced a different outcome). Accordingly, the Court finds that Defendant's review procedures substantially complied with the relevant regulations. *See Smith v. Newport News Shipbuilding Health Plan,* 148 F.Supp.2d 637, 649 (E.D.Va.2001) (finding substantial compliance despite alleged failure to produce medical reports where plaintiff was not prejudiced).

### III. CONCLUSION

For the foregoing reasons, the Court GRANTS Defendant's Motion for Judgment on the Administrative Record.

SO ORDERED.