Miller v. Nortel                    CV-03-258-PB   1/25/05

### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW HAMPSHIRE

**Robert H. Miller**

    v.

Civil No. 03-258-PB
Opinion No. 2005 DNH 012

**Nortel Networks Long Term
Disability Plan and Nortel
Networks, Inc.**

### MEMORANDUM AND ORDER

Robert H. Miller brings this action pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), to recover benefits allegedly due him under the terms of the Nortel Networks Long-Term Disability Plan (the "Plan"). In Count I of the Complaint, Miller alleges that the Plan administrator's decision to deny him long-term disability benefits was arbitrary and capricious. See Compl. ¶¶ 41-46. In Count II, he alleges that the Plan's administrator breached its fiduciary duty to administer the Plan in a manner consistent with its purposes. See Compl. ¶¶ 47-51. Finally, in Count IV, Miller charges that his employer, Nortel Networks, Inc., misrepresented

the position for which he was hired, his job security, and his benefits package.[1]  See Compl. ¶¶ 57-62.  Miller alleges that he reasonably relied on Nortel's misrepresentations in leaving his previous job, and this reliance has caused him to suffer damages, including lost wages, lost benefits, and emotional distress.  See id., ¶¶ 63-64.  Before me are Miller's Motion for Partial Summary Judgment and Nortel's Motion for Summary Judgment.  For the reasons set forth in this Memorandum and Order, I grant Nortel's motion as to all counts and deny Miller's motion.

## I.  BACKGROUND[2]

### A.  Miller's Employment with Nortel

Robert Miller was employed as a senior thin film engineer at Barr Associates when he became interested in working for Nortel.

---

[1]  Count III of the Complaint alleged that defendant Prudential Insurance Company of America, Inc., which provided administrative services to the Plan, breached its fiduciary duty to Miller by administering his claim in an arbitrary and capricious manner.  See Compl. ¶¶ 52-56.  This count was voluntarily dismissed on September 8, 2003, along with Miller's other claims against Prudential.

[2]  The facts, construed in the light most favorable to Miller, are drawn from the parties' pleadings and accompanying exhibits.

See Def.'s Ex. 1, Miller Dep. at 19:17-19. In the fall of 2000, Miller learned that Nortel had a particular piece of analytical equipment that interested him, a piece that Barr Associates was unable to afford. Id. at 19:20-20:6. Miller sent an email to a Nortel manager, attaching his resume, and asking both to see the equipment and to discuss the possibility of employment. Id. at 20:21-21:2. In response, Nortel representative, Masud Azimi, contacted Miller in late November 2000, and invited him to tour Nortel's Wilmington, Massachusetts facility. Id. at 20:2-23. During this tour, Miller met with a number of Nortel employees. After the tour, Miller was invited to return to Nortel's Wilmington facility in mid-December 2000. Id. at 23:1-12. At the second meeting, Miller spoke with Peidong Wang, another Nortel representative, as well as several other Nortel employees. Based on his conversations with company representatives, including Azimi and Wang, as well as recruiters Tom Hurley and Pam Wilkie, Miller formed the "overall impression" that Nortel was an excellent company with outstanding benefits that would offer long-term security and interesting, rewarding work. Id. at 24-26. Miller's positive impression of Nortel was bolstered by reports from various employees who purportedly told him that

Nortel planned to expand its operation to a facility in Billerica, Massachusetts, and encouraged him to drive by the proposed site. Id. at 27:7-19.

In December 2000, Miller entered into discussions with Wang regarding the possibility of employment. On December 21, 2000, Wang contacted Miller by telephone and offered him a position as a senior thin film engineer. See Def.'s Ex. 1, Miller Dep. at 28:6-7, 29:4-19. The following day Wang sent Miller an email that stated in relevant part,

> Robert: Here is what we discussed last night.
> Hopefully you can join us as soon as everything clears
> out. . . . I wish you can join us in Jan. 15 or
> earlier.

Def.'s Ex. 5. Miller then received a formal offer of at-will employment in a letter from Pam Wilkie dated February 2, 2001. Def.'s Ex. 2. Miller signed the letter, indicating that he understood and accepted the terms of Nortel's offer, on February 4, 2001. Id.

In January 2001, however, prior to accepting the job at Nortel, Miller read a report stating that the company was planning to cut 4,000 jobs over six months. Def.'s Ex. 6. Concerned about the potential impact this news would have on his

employment status, Miller sent an email to Wang on January 11, 2001, asking him if the pending layoffs would impact Nortel's Wilmington facility. Id. Specifically, Miller asked,

> I have been hearing grim reports about pending Nortel layoffs. How do these events affect your expansion plans in Wilmington?

Id. Wang replied, in a January 14, 2001 email, that

> I am working on your case. Hopefully we can have an answer soon. There will be no layoffs here. However, we have to wait until we can have the green light to hire more needed people again.

Id. About two weeks later, on January 31, 2001, Miller sent an email to Wang asking him when he should expect a formal offer. Def.'s Ex. 7. On February 1, 2001, Wang replied by email and explained to Miller that

> I know you are anxious to hear from me. With the current hiring freeze, the things change everyday. We have submitted your case to upper upper management fro [sic] approval. It could take some time, but nothing is garanteed [sic] at this time. We are doing our best. . . . Pam [Wilkie] is now handling the recruiting at this difficult time. I copied your message to her. . . .

Id. Later that day, Wilkie notified Miller by email that he had been approved for hiring. Def.'s Ex. 8. She further informed him that she would try to send the formal offer letter to him the following day. Id. Miller received this letter and signed it,

-5-

accepting Nortel's offer on February 4, 2001.  Def.'s Ex. 2 at P-MILLER 0003.

Miller started work as a senior thin film engineer at Nortel's Wilmington facility on February 26, 2001, and enrolled in Nortel's benefit plans.  He also executed his right to purchase optional long-term disability coverage, which increased his long-term disability ("LTD") benefits for an additional premium.  See Def.'s Ex. 1, Miller Dep. at 10:6-14; Pl.'s Ex. 36 at P-MILLER 0085.

## B.   The Plan

In 2001 and 2002, Nortel's Short-Term and Long-Term Disability Plans were comprised of four documents.[3]  Affidavit of Debbie Lorimer at ¶ 3 ("Lorimer Aff.").  Under the "ELIGIBILITY" section of the Plan, a regular employee "working 20 or more hours per week" would be eligible to participate in the disability Plan.  Def.'s Ex. 10 at P-MILLER 0014.  The Plan designated the Prudential Insurance Company of America as the Claims

---

[3]  Miller argues that a fifth document, entitled "Welcome to Nortel You Are Now Connected," Pl.'s Ex. 40, should also be included as part of the Plan.  I decline to express an opinion on this issue as its resolution has no bearing on the disposition of the case.

-6-

Administrator to handle participants' claims for benefits. See Def.'s Ex. 12 at P-MILLER 0036-0039. Prudential's role was governed by an Administrative Services Agreement. See Def.'s Ex. 14. The Plan also designated Nortel as the Plan administrator, and Nortel, in turn, designated its own Employee Benefits Committee ("EBC") as the final authority in reviewing denied claims for benefits under the Plan. See Def.'s Ex. 12 at P-MILLER 0036-0037.

The Plan's section on "WHEN COVERAGE BEGINS" provides that "[]Short-Term Disability and []Long-Term Disability coverage is automatically effective on the first day [a participant is] Actively at Work as a new Employee." Def.'s Ex. 10 at P-MILLER 0017. A Plan participant seeking benefits must file a claim with Prudential, which conducts a review of the claim under the Plan and either accepts or denies it. A participant whose claim is denied may then appeal that decision to Prudential. If Prudential denies the first appeal, the participant may then file a second and final appeal with Nortel's EBC. See Def.'s Ex. 12 at P-MILLER 0043-0044.

1.    Short-Term Disability Benefits

Under the Plan, Short-Term Disability ("STD") benefits are available to Plan participants who "become Totally Disabled by an accidental bodily Injury or Illness while [they] are covered under the plan." Def.'s Ex. 10 at P-MILLER 0019. The Plan pays a weekly STD benefit of 100% of the participant's gross pre-disability earnings for up to six weeks, and then 70% of the participant's gross pre-disability earnings for up to 20 additional weeks, for a total of approximately six months of coverage. Def.'s Ex. 10 at P-MILLER 0020. STD benefits end when the participant's eligibility ends, when he or she is no longer Totally Disabled, or when he or she has received 26 weeks of STD benefits.

2.    Long-Term Disability Benefits

Long-Term Disability ("LTD") benefits under the Plan are paid to eligible participants who have been Totally Disabled for the 26-consecutive week STD period, provided that, before the end of the STD period, he or she has submitted written proof of Total Disability that is satisfactory to Prudential. Def.'s Ex. 10 at P-MILLER 0026. The maximum length of time that LTD benefits will

be paid depends on the participant's age at the time Total Disability begins, but generally ranges from six months for employees age 75 and older, and up to age 65 for employees younger than 60.  Def.'s Ex. 10 at P-MILLER 0027.

The Plan's LTD component also includes a number of exclusions, including a "Preexisting Conditions Exclusion" which provides in relevant part,

**Exclusions**

LTD benefits will not be paid for any disability that is in any way caused by . . .

• a Preexisting Condition . . . .

***Preexisting Conditions Exclusion***

If you are a newly hired Employee, you will not be covered for 12 months after coverage is effective for any disability caused or in any way related to a condition existing within 90 days of your coverage Effective Date.

A "Preexisting Condition" is an Illness, Injury or condition for which you:

• received treatment or services from a Physician,
• took drugs or medicines prescribed by a Physician.
• incur expenses or
• receive a diagnosis.

Def.'s Ex. 10 at P-MILLER 0032.

## C. Miller's History of Lymphoma

In October 1998, while living in Colorado, Miller was diagnosed with low grade, unagressive non-Hodgkins Lymphoma. See Def.'s Ex. 15 at P-MILLER 0239; Def.'s Ex. 1, Miller Dep. at 13:20-14:1. He was treated with chemotherapy and went into partial remission. Pl.'s Ex. 6 at P-MILLER 0239. Then, in December 1999, he was found to have a pelvic mass. Id. A biopsy revealed the presence of a low-grade lymphoma. Id. Thereafter, in early 2000, a second biopsy revealed that Miller had "mantle cell lymphoma." Id. By October 2000, Miller was in "clinical remission," although an abdominal CAT scan indicated evidence of retroperitoneal adenopathy.[4] Id. From December 1999 through the summer of 2001, Miller was treated for his lymphoma by Dr. Sherman Baker, an oncologist. See Def.'s Ex. 1, Miller Dep. at 44:10-19.

On or about February 2, 2001, Dr. Baker determined that Miller's lymphoma had probably recurred. See Def.'s Ex. 15 at P-

---

[4] "Retroperitoneal adenopathy" is the swelling or morbid enlargement of the lymph nodes located behind the peritoneum, the thin membrane that lines the abdominal and pelvic cavities and covers most abdominal viscera. See Stedman's Medical Dictionary, 26, 1170, 1355 (25th ed. 1990).

MILLER 0335. One week later, on February 9, 2001, Miller had a CAT scan, as Dr. Baker had recommended. See id. at P-MILLER 0290-0291. On February 22, 2001, Dr. Charles Leutzinger, with whom Miller had consulted, noted that the CAT scan showed "lymphadenopathy within the retroperitoneum starting at approximately the L3 level and extending into the pelvis, with the overall size of the mass increased since the September examination, and measuring approximately 11 centimeters in the greatest dimension." Id. at P-MILLER 0290. Dr. Leutzinger characterized Miller's condition as "[n]on-Hodgkin's lymphoma status post-chemotherapy with regrowth of disease four months after completion of treatment." Id. at P-MILLER 0291. The day after Miller started work at Nortel, on February 27, 2001, Dr. Leutzinger began treating Miller with radiation for "Stage IV non-Hodgkin's lymphoma." See id. This treatment lasted until March 28, 2001. See id.

In July 2001, a surgical pathology consultation report of Miller's condition indicated that "the findings are consistent with malignant lymphoma, B cell type," and that this "most likely represents evolution of this patients [sic] reported low grade lymphoma." Id. at P-MILLER 0298. The July 24, 2001 notes of Dr.

-11-

Jon Posner, who succeeded Dr. Baker as Miller's oncologist, reflect his view that Miller was suffering from "a stage IV non-Hodgkin's lymphoma which clinically is moving ahead after CVP in 1998. . . ." Id. at P-MILLER 0286. Nearly one month later, on August 23, 2001, Miller again consulted with Dr. Leutzinger, who indicated that Miller had "[p]rogressive non-Hodgkin's lymphoma with bilateral neck axillary adenopathy and associated venous compression." Id. at P-MILLER 0412-0413. Based on this consultation, Dr. Leutzinger elected to treat Miller with "further systemic chemotherapy." Id.

Miller proceeded with chemotherapy treatments, but as Dr. Leutzinger noted on October 9, 2001, the treatments did not provide him with the relief his physicians expected. See id. at P-MILLER 0411. Miller was then treated with radiation from October 10, 2001 through November 7, 2001. See id. at P-MILLER 0410. In Dr. Leutzinger's treatment summary for this period, he indicated that Miller's initial diagnosis was "[n]on-Hodgkin's lymphoma with progressive adenopathy, edema, etc. after ICE chemotherapy" and his final diagnosis was "[n]on-Hodgkin's lymphoma with dramatic regression of visible and palpable adenopathy." Id. Finally, Dr. Posner's December 4, 2001

-12-

"History and Physical" report concluded that Miller was suffering from "Stage IV diffuse large cell lymphoma converting from a 1998 low grade lymphoma." Id. at P-MILLER 0241.

D.    **Short-Term Disability Benefits**

In the early summer of 2001, Miller learned that his non-Hodgkin's lymphoma had progressed. According to Miller, he informed his supervisor of his condition and continued to work as much as he could around his treatment schedule. In August 2001, however, Miller's physicians told him that he would have to take time off from work and go on disability because he required chemotherapy treatments. Miller then reported this development to his supervisor, and continued to work as much as he could. On or about October 15, 2001, however, he was forced to take a leave of absence.

In late October 2001, Miller was informed by Nortel that his employment would be terminated and was offered a severance package in exchange for a release of all claims against Nortel. Compl. ¶ 13. Miller refused to accept the agreement and instead retained counsel. Id. Miller's attorney contacted Nortel's counsel and they agreed both that Miller would go out on STD and

that his employment would not be terminated while he was on STD.[5] Id. at ¶ 14. On his application for STD benefits, Miller's treating physician, Dr. Posner, indicated that his diagnosis of Miller was "lymphoma relapsed." See Def.'s Ex. 16. Miller's application was approved and he received short-term disability benefits for 26-consecutive weeks, the maximum STD period, from October 15, 2001 through April 14, 2002. See Def.'s Ex. 1, Miller Dep. at 76:1-7.

### E.    Application for Long-Term Disability Benefits

Miller filed an application for LTD benefits under the Plan on February 7, 2002, as his STD benefits period was approaching its end. See Def.'s Ex. 17; Def.'s Ex. 1, Miller Dep. at 78:11-12, 79:3-10. He indicated on the LTD application that

---

[5] The record is devoid of any evidence identifying the reason Nortel terminated Miller's employment, or even the precise date of his discharge. Nortel contends that he was discharged from employment on January 1, 2003. See Def.'s Mot. for Summ. J. at ¶ 13. Miller, however, believed he had been terminated on June 1, 2003, until October 29, 2004 when he telephoned Nortel's Pension Service Center Office regarding withdrawal of his vested pension funds. See Pl.'s Obj. to Def.'s Mot. for Summ. J. at 3 & n.1. During that telephone call, Miller was informed that Nortel still considered him an active employee on a leave of absence. See Affidavit of Robert Miller ¶ 1. In any event, Miller is not claiming the termination itself was wrongful, nor does he claim breach of his employment contract. Pl.'s Obj. to Def.'s Mot. for Summ. J. at 11.

-14-

"[r]ecalcitrant Non-Hodgkin's Lymphoma" was the condition that prevented him from working. See Def.'s Ex. 17. Miller anticipated that the LTD benefits would begin as soon as the STD benefits ended, and continue for 30 months, based on his age at the time he filed his application.

On March 5, 2002, Prudential sent a letter to Miller, notifying him that it was "currently reviewing" his claim for LTD benefits and requesting his medical records for the period between November 25, 2000 and February 25, 2001. See Def.'s Ex. 18. Citing the Plan's Preexisting Conditions Exclusion, the letter informed Miller that his medical records were required to "determine if [his] medical condition supports total disability or is not excluded under the pre-existing conditions exclusion. . . ." Id. Miller timely complied with this request. See Pl.'s Ex. 43 & 44. Prudential followed with a letter dated March 19, 2002, informing Miller that it had received the medical documentation. See Def.'s Ex. 19. The letter also asked Miller to notify Prudential "if this information is to be reviewed for an appeal of your claims for Long Term Disability benefits." Id. On about March 22, 2002, Miller contacted Prudential by telephone and was informed that his LTD benefits claim had in fact been

denied on March 21, 2002, due to the Preexisting Conditions Exclusion.[6]  See Def.'s Ex. 1, Miller Dep. at 93:6-9.

**F.    Appeals**

On April 9, 2002, Miller's attorney, John LaRivee, Esq., wrote to Prudential to appeal the denial of Miller's claim for LTD benefits.  See Def.'s Ex. 21.  He informed Prudential that Miller had not yet received a letter officially notifying him of the denial.  See id.  He also requested copies of all applicable Plan documents.  See id.  LaRivee then referenced the Plan's Preexisting Conditions Exclusion and argued that a plain language reading of the phrase "for 12 months" supported Miller's position that "there will be no coverage for 12 months.  Beyond that there is coverage regardless of whether there was a pre-existing condition or not."  Id.  In LaRivee's view, "[n]othing in the exclusion says otherwise."  Id.  Accordingly, he urged Prudential

_____

[6]  Prudential purportedly prepared a letter, dated March 21, 2002, informing Miller that his claim for disability benefits had been denied and setting forth the basis for the denial.  See Def.'s Ex. 20.  Miller claims, and for the purpose of this Memorandum and Order I accept, that he did not receive this letter until December 2003, during discovery.  See Def.'s Ex. 1, Miller Dep. at 95:19-96:7.  Nortel has not offered any explanation as to why this letter was prepared after the March 19, 2002 letter in which it asked Miller if he wanted to appeal the denial of benefits.

-16-

to "take a serious look at this exclusion and what it really says before responding with a knee jerk denial of Mr. Miller's appeal." Id. Finally, LaRivee disputed Prudential's conclusion that the non-Hodgkin's lymphoma from which Miller suffered on his date of hire was related to the lymphoma that forced him out of work. Id. One week later, on April 16, 2002, Debbie Lorimer of Nortel's benefits department sent Attorney LaRivee copies of the Plan, including the Administrative Information section. See Def.'s Ex. 22.; Ex. 1, Miller Dep. at 98:17-99:8. Several weeks after that, on May 23, 2002, Prudential informed Miller that he could submit for consideration any additional information pertaining to his appeal. See Def.'s Ex. 23; Ex. 1, Miller Dep. at 100:1-101:4.

By letter dated June 4, 2002, Prudential denied Miller's appeal and upheld its initial decision denying his claim for LTD benefits, again relying on the Plan's Preexisting Conditions Exclusion. See Def.'s Ex. 24. Specifically, Prudential noted that Miller stopped working "within the 12 months of the date he became a Covered Employee" for LTD coverage. Id. at P-MILLER 0179. Prudential then explained that it had reviewed medical information from Miller's physicians, Dr. Leutzinger and Dr.

Posner, and determined that on February 22, 2001, Miller's "chief complaint was non-Hodgkin's lymphoma (stage IV)" and that he went out of work for lymphoma, a condition that was related to a condition existing within 90 days of his coverage Effective Date.[7]  Id.  Prudential next informed Miller that although he alleged that the lymphoma that forced him out of work was not the same as that for which he was treated earlier, the Plan "indicates that if you go out of work for a condition that is in any way related to a condition existing within 90 days of the [coverage Effective Date], benefits are not payable."  Id. Prudential disagreed with LaRivee's interpretation of the Plan's Preexisting Conditions Exclusion and explained that because Miller stopped working within 12 months of the date he became a Covered Employee for LTD coverage, and his claim was subject to the Preexisting Conditions Exclusion.  Thus, under the terms of the Plan he was not entitled to collect LTD benefits.  See id. Finally, the letter informed Miller that any further appeal should be directed to Nortel's EBC.  See id.

---

[7]  Pursuant to the terms of the Plan, Miller's coverage Effective Date was February 26, 2001, his Hire Date.  See Def.'s Ex. 10 at P-MILLER 0017.

-18-

On August 2, 2002, Attorney LaRivee filed an appeal with the EBC on Miller's behalf.[8]  See Def.'s Ex. 25.  In this letter, he referenced the reasoning of his April 9, 2002 letter, further explained his interpretation of the Plan's Preexisting Conditions Exclusion, and criticized Prudential's June 4, 2002 letter for failure to cite to specific Plan provisions to corroborate its reasoning.  See id. at P-MILLER 0173.  LaRivee also disputed Prudential's assertion that because Miller stopped working within 12 months of his date of hire, he would have to return to work and file a subsequent claim in order to be covered under the Plan and be eligible for LTD benefits.  See id. at P-MILLER 0174. Urging Prudential to reconsider and reverse its original decision, LaRivee argued that Miller's benefits "were to have commenced on April 15, 2002, a date beyond 12 months from the start of his employment and thus beyond the 12 month period the pre-existing condition exclusion was in effect."  Id. at P-MILLER 0173-0174.

---

[8]  On August 8, 2002, Attorney LaRivee sent an additional letter to the EBC, enclosing a letter of support from Dr. Posner. See Def.'s Ex. 26.

In response, by letter dated November 21, 2002, the EBC denied Miller's appeal and upheld Prudential's decision on Miller's LTD benefits claim.[9]  See Def.'s Ex. 27.  The denial letter explained why the EBC rejected LaRivee's interpretation of the LTD Plan's terms.  See id. at P-MILLER 0161.  The letter then reiterated the reasoning behind Prudential's March 21, 2002 letter initially denying Miller's claim, and the June 4, 2002 letter denying Miller's first appeal.  See id. at P-MILLER 0161-0162.  After summarizing Miller's argument in support of his appeal, the letter then stated that the EBC declined to reverse Prudential's decision.  Id. at P-MILLER 0162.  According to the EBC, that conclusion was "based upon the clear and unambiguous terms of the LTD plan."  Id.

Next, the EBC described the particular Plan provisions on which it relied in upholding Prudential's determination.  First, the EBC noted that LTD Plan "establishes that an individual qualifies for an LTD Plan benefit only if it begins immediately

---

[9]  Miller points out that the letter identified his attorney by the wrong name in the salutation and incorrectly identified him as an electrical engineer.  Although certainly sloppy work on Nortel's part, there is no evidence to suggest that these mistakes affected the EBC's handling of Miller's claim.

after the conclusion of the STD Plan benefit period, while the individual has coverage under the LTD Plan." Id. at P-MILLER 0163. Citing to the sections entitled "Core LTD Benefits" under "When Benefits Begin and End," the EBC concluded that there are no provisions for payment of an LTD Plan benefit at any time other than immediately following the termination of the 26 weeks of STD Plan Benefits, and Miller was not eligible for payment under the LTD Plan immediately following the 26 week STD period because he was not entitled to coverage at that time. Id. at P-MILLER 0164.

Second, the EBC pointed out that "Total Disability must be continuous and there must be continuous monitoring . . . for the LTD Plan benefit to continue." Here, the EBC concluded that there has been no continuous monitoring of whether Miller was under the regular care of a Physician or whether he continued to be unable to perform the functions of his normal work at each possible review date." Id.

Third, citing once again to the Plan's Preexisting Conditions Exclusion, as well as to the section entitled "WHEN COVERAGE ENDS," the EBC explained that the "LTD Plan does not pay benefits to individuals who leave their active employment within

-21-

12 months after their initial coverage effective date and do not return to active employment." Id. at P-MILLER 0164-0165. The EBC determined that Miller's coverage under the Plan ended when his STD Plan benefit ended and he was not approved for the LTD Plan benefit due to a preexisting condition, and also did not return to work. Id. at P-MILLER 0165. On that date, the EBC explained, Miller stopped qualifying for coverage. Id.

Having exhausted his administrative appeals, Miller commenced this suit.

## II. STANDARD OF REVIEW

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue is one "that properly can be resolved only by a finder of fact because [it] may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). A material fact is one that affects the outcome of the suit. See id. at 248.

In ruling on a motion for summary judgment, I must construe the evidence in the light most favorable to the non-movant. See Navarro v. Pfizer Corp., 261 F.3d 90, 94 (1st Cir. 2001). The party moving for summary judgment, however, "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has properly supported its motion, the burden shifts to the nonmoving party to "produce evidence on which a reasonable finder of fact, under the appropriate burden of proof, could base a verdict for it; if that party cannot produce such evidence, the motion must be granted." Ayala-Gerena v. Bristol Myers-Squibb Co., 95 F.3d 86, 94 (1st Cir. 1996)(citing Celotex, 477 U.S. at 323; Anderson, 477 U.S. at 249). Neither conclusory allegations, improbable inferences, or unsupported speculation are sufficient to defeat summary judgment. See Carroll v. Xerox Corp., 294 F.3d 231, 236-37 (1st Cir. 2002).

When a denial of benefits is challenged under ERISA, § 1132(a)(1)(B), "the standard of review depends largely upon

-23-

whether 'the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.'" Leahy v. Raytheon Co., 315 F.3d 11, 15 (1st Cir. 2002)(quoting Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989)). If discretionary authority is clearly given under the benefit plan, "a deferential arbitrary and capricious standard of review is mandated." See id., see also Terry v. Bayer Corp., 145 F.3d 28, 37 (1st Cir. 1998). This standard means that "the administrator's decision will be upheld if it is reasoned and 'supported by substantial evidence in the record.'" Vlass v. Raytheon Employees Disability Tr., 244 F.3d 27, 30 (1st Cir. 2001)(quoting Associated Fisheries of Maine, Inc. v. Daley, 127 F.3d 104, 109 (1st Cir. 1997)). As such, reasoned denials of benefits that are supported by substantial evidence will survive review under this standard. See Doyle v. Paul Revere Life Ins. Co., 144 F.3d 181, 184 (1st Cir. 1998). Substantial evidence means evidence that is "reasonably sufficient to support a conclusion." Vlass, 244 F.3d at 30.

Miller disputes Nortel's contention that its rejection of Miller's claim should be reviewed under the arbitrary and capricious standard. At the root of the parties' dispute over

-24-

the proper standard of review is their sharp disagreement over exactly what document or documents comprise the "Plan."

Nortel asserts that there are four documents that collectively constitute both the "Plan" and the Summary Plan Description ("SPD"). Lorimer Aff. at ¶ 3. These four documents, which incorporate each other by reference, are: (1) "In This Section," Def.'s Ex. 10 ("In This Section Document"); (2) "US - BENEFITS Employee Benefits and Programs FLEX Overview," Def.'s Ex. 11 ("Flex Overview Document"); (3) "US - BENEFITS Employee Benefits and Programs Administrative Information," Def.'s Ex. 12 ("Administrative Information Document"); and (4) "Employee Benefits and Programs Glossary," Def.'s Ex. 13 ("Program Glossary Document"). Id. These documents, Nortel maintains, are interrelated and must be construed together. Notably, the FLEX Overview Document directs Plan participants to the Administrative Information Document for further details about the Plan, including how to file claims and how to appeal claims that have been denied. Def.'s Ex. 11 at P-MILLER 0096. The Administrative Information Document then identifies Nortel Networks, Inc. as the Plan administrator and provides that:

> The EBC [Employee Benefits Committee] has the final discretionary authority to construe and to interpret the plan, to decide all questions of eligibility for benefits and to determine the amount of benefits. The EBC's decisions on such matters are final and conclusive.

Def.'s Ex. 12 at P-MILLER 0044. This language, Nortel argues, is sufficient to give the Plan administrator the requisite discretionary authority to warrant application of the arbitrary and capricious standard of review.

Miller responds by arguing that the language Nortel relies on is irrelevant because it is not clear that the Administrative Information Document is a part of the Plan. I disagree. Even if Miller is correct in claiming that it is unclear whether the Administrative Information Document is a part of the Plan rather than merely a part of the SPD, his argument fails because the inclusion of discretionary language in an SPD is sufficient to confer discretionary authority on the Plan administrator. This point was made clear in Wade v. Life Ins. Co. of N. America, 271 F. Supp. 2d 307, 318 (D. Me. 2003). There, discretionary language in an SPD stated that both the Plan administrator and the defendant insurance company retain "the power . . . to make all determinations that the Plan requires for its administration,

and to construe and interpret the Plan whenever necessary to carry out its intent and purposes and to facilitate its administration." Id. at 318. The defendant insurance company asserted that this language granted it sufficient discretionary authority to warrant application of the arbitrary and capricious standard. Id. The plaintiff countered that the SPD, standing alone, was insufficient to confer the necessary discretion on the defendant without some additional grant of authority in the policy. Id. The court agreed with the defendant and found that this language was sufficient to confer discretionary authority. In doing so, the court held that "[t]he location of the relevant language within the SPD rather than the Policy does not change this conclusion." Id. at 318-19; see also Sidou v. Unumprovident Corp., 245 F. Supp. 2d 207, (D. Me. 2003) (finding that grant of discretionary authority in SPD is sufficient to warrant arbitrary and capricious standard of review because SPD is a plan document). I agree with the court's reasoning in Wade and thus conclude that the Plan's grant of discretionary authority in the Administrative Information Document is sufficient to vest Nortel with discretion even if the Administration Information Document is only a part of the SPD rather than a part of the Plan.

Miller alternatively argues that I must apply a heightened standard of review because Nortel was subject to a conflict of interest. He asserts that the conflict existed because Nortel is responsible for paying for any benefits awarded under the Plan. Again, I disagree. The First Circuit has held that "[t]o affect the standard of review, . . . a conflict of interest must be real. A chimerical, imagined, or conjectural conflict will not strip the fiduciary's determination of the deference that otherwise would be due." Leahy, 315 F.3d at 16 (citing Doyle, 144 F.3d at 184). It is no more than mere conjecture to allege that a conflict exists "simply because an award of benefits would come from the same entity that is responsible for determining the eligibility for those benefits." Robinson v. Unum Life Ins. Co. of Am., No. Civ. 02-6-B, 2003 WL 1193017, at *5 (D.N.H. Mar. 12, 2003); see also Smith v. Fortis Benefits Ins. Co., No. Civ. 02-55-B, 2003 WL 1049959, at *4 (D.N.H. Mar. 6, 2003)(finding no actual conflict where insurer served as both plan administrator deciding claims and employer paying out claims). Without more, this general assumption does not indicate that Nortel was improperly motivated. Id. Furthermore, the only other evidence Miller has produced to bolster his theory that Nortel was

improperly motivated when it denied his claim is unpersuasive.
For example, evidence that Miller is in his sixties and suffering
from cancer, that Nortel may have made misrepresentations to him
during the hiring process, and that Nortel is "mired in an
accounting scandal that has led to criminal and securities
investigations" and "numerous lawsuits" is simply insufficient to
demonstrate the existence of an actual conflict.  See Leahy, 315
F.3d at 16.  Finding no evidence of a conflict of interest, I
must apply an arbitrary and capricious standard of review and
proceed to ensure that the denial of long-term benefits was not
"objectively unreasonable in light of the available evidence."
Pari-Fasano v. ITT Hartford Life and Accident Ins. Co., 230 F.3d
415, 419 (1st Cir. 2000).

## III.  DISCUSSION

### A.  The Claim for Benefits

Miller argues that Nortel's denial of his claim was
arbitrary and capricious for three reasons.  First, he asserts
that the evidence does not support Nortel's determination that
his disability was caused by a preexisting condition.  Second, he
argues that Nortel based its decision on an unreasonable

interpretation of the Preexisting Conditions Exclusion.  Finally,
he contends that he is entitled to benefits because Prudential
failed to give him proper notice of its initial decision to deny
his claim.  I examine each argument in turn.

    1.    <u>The Determination that Miller's Disability was
Caused by a Preexisting Condition is Supported
By Substantial Evidence in The Record</u>

Miller first challenges Nortel's decision that his
disability was the result of a preexisting condition.  I reject
this argument.  The medical records show that Miller sought
treatment for lymphoma within 90 days of his date of hire.
Specifically, the records indicate that on February 9, 2001,
Miller had a CAT scan that, as Dr. Leutzinger noted on February
22, 2001, reflected "lyphadenopathy with the retroperitonem
starting at approximately the L3 level and extending into the
pelvis, with the overall size of the mass increased since the
September examination. . . ."  Based on these results, Dr.
Leutzinger concluded that Miller was suffering from "Non-
Hodgkin's lymphoma status post-chemotherapy with regrowth of
disease four months after completion of treatment."  Several
months later, in June, 2001, a biopsy report showed that Miller
had a "malignant lymphoma, B cell type," which "most likely

-30-

represents evolution of this patient's reported low grade lymphoma." In addition, Dr. Posner's July 24, 2001 notes reveal his conclusion that Miller was suffering from "a stage IV non-Hodgkin's lymphoma which is clinically moving ahead after CVP in 1998. . . ," and his notes from December 4, 2001 reflect his belief that Miller had "[s]tage IV diffuse large cell lymphoma converting from a 1998 low grade lymphoma." Finally, Dr. Posner indicated on Miller's October 2001 application for STD benefits that Miller required a leave of absence due to a relapse of his previously diagnosed lymphoma.

These medical findings provided sufficient evidence to support Nortel's determination that Miller left work and sought disability benefits for a preexisting condition. I thus conclude that the Plan administrator's determination on this point was reasonable.

2. The Plan Administrator's Interpretation of the Plan's Terms was Reasonable

Nortel concluded that the Plan's Preexisting Conditions Exclusion establishes a 12-month waiting period before LTD coverage begins for disabilities that are caused by a preexisting condition. Under its interpretation, an employee cannot obtain

LTD coverage for such disabilities unless he is able to return to work after the waiting period expires. Because Nortel determined that Miller's disability was caused by a preexisting condition and he did not return to work after the waiting period expired, Nortel concluded that Miller never acquired coverage for his disability.

Miller responds by arguing that Nortel's interpretation is insupportable. He asserts instead that an employee acquires LTD coverage for all covered disabilities - including those caused by a preexisting condition - as soon as the employee begins to work. The Exclusion, he argues, thus operates merely as a waiting period before benefits can begin rather than a coverage waiting period.[10]

---

[10] Miller alternatively suggests that he is entitled to benefits even if the Exclusion establishes a coverage waiting period because coverage for disabilities that are caused by a preexisting condition begins automatically as soon as the waiting period is satisfied. I disagree. The Exclusion does not state that coverage commences when the waiting period is satisfied and the Plan elsewhere provides that an employee must be actively at work for coverage to commence. See Def.'s Ex. 10 at P-MILLER 0017. Since Miller was not actively at work at any point after the coverage waiting period expired, he never acquired LTD coverage for disabilities that are caused by a preexisting condition.

I am unpersuaded by Miller's argument for several reasons. First, Miller's interpretation cannot be reconciled with the Plan language. The Preexisting Conditions Exclusion states that a claimant will not be "covered" during the first 12 months of employment for disabilities that result from a preexisting condition. The Plan elsewhere draws an explicit distinction between the time when "coverage" begins, see Def.'s Ex. 10 at P-MILLER 0017, and the time when "benefits" begin. See Def.'s Ex. 10 at P-MILLER 0021, 0026. Further, when the Plan elsewhere provides for a waiting period before benefits can begin, it does so by stating in a straightforward fashion that "*benefits* will begin as soon as you have been Totally Disabled for the 26 consecutive week waiting period . . . ." Def.'s Ex. 10 at P-MILLER 0026 (Emphasis added). Under these circumstances, it is difficult to accept Miller's position that the phrase "you will not be covered" should be read to mean "benefits will not begin."

Second, notwithstanding Miller's argument to the contrary, Nortel's interpretation of the Preexisting Conditions Exclusion is linguistically plausible. To be sure, the interpretive fit is not perfect. The Exclusion confusingly states that "you will not be covered for 12 months after coverage is effective . . . ."

-33-

Read literally, this phrase is problematic because it is difficult to see how coverage can be effective during the first 12 months if, as the Plan states, there is no coverage during that period. Nevertheless, given the absence of plausible alternative readings, it is reasonable to construe the quoted language to mean merely that the Plan does not provide LTD coverage for disabilities that are caused by a preexisting condition during the 12 month period after LTD coverage is otherwise effective.

Third, the results that follow from Nortel's interpretation serve rational ends. The net effect of Nortel's interpretation is to allow an employee to collect LTD benefits for a disability that is caused by a preexisting condition only if the employee is actively at work at any point more than one year after the employee's first day of work. It is entirely rational for an employer such as Nortel to have intended such a result. Thus, because Nortel's proposed interpretation is both consistent with the Plan language and achieves rational results, I cannot say that its interpretation was arbitrary or capricious.

### 3. The Violations of the Notice Requirements Do Not Require Reversal

Miller charges that the Prudential violated the requirements of 29 U.S.C. § 1133 and that section's implementing regulation, 29 C.F.R. § 2560.503-1(f).[11] Specifically, Miller alleges that: (a) Prudential failed to notify him of the initial denial of his claim; (b) Prudential requested additional information from him even though it had already decided to deny his claim; and (c) the EBC's denial of his appeal included three new reasons for the denial. In light of these procedural errors, Miller contends that Nortel's denial of his claim should be reversed. Nortel counters that any violation of ERISA's notice requirement does

---

[11] Section 1133 specifies that a plan "shall provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant." 29 U.S.C. § 1133(1). The interpretive regulations, found at 29 C.F.R. § 2560.503-1(f), require that the notice contain,
> (1) The specific reason for the denial;
> (2) Specific reference to pertinent plan provisions on which the denial is based;
> (3) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary; and
> (4) Appropriate information as to the steps to be taken if the participant or beneficiary wishes to submit his or her claim for review.

not require reversal of the Plan administrator's decision because Miller received a "full and fair review" of his claim, as is required, and because he has not proffered any evidence that he was prejudiced by the procedural defects.

The evidence is clear that Prudential failed to strictly comply with 29 C.F.R. § 2560.503-1(f): Miller was not notified in writing that his original claim for LTD benefits had been denied, and there is no evidence that he received Prudential's March 21, 2001 letter explaining the basis for the denial.[12] Undoubtedly, Miller was entitled to an explanation of the decision. Unfortunately for Miller, "ERISA's notice requirements are not meant to create a system of strict liability for formal notice failures." Terry, 145 F.3d at 39. Not all procedural defects will therefore require reversal of a plan administrator's decision. In fact, "[s]ubstantial compliance with the regulations is sufficient." Id. (quoting Donato v. Metropolitan Life Ins. Co., 19 F.3d 375, 382 (7th Cir. 1994)). Here, the

_____

[12] The evidence is also clear that Prudential's June 4, 2002 letter denying Miller's first appeal substantially complies with the requirements of 29 C.F.R. § 2560.503-1(f), as does the EBC's November 21, 2002 letter denying Miller's final appeal. Both letters cite the Preexisting Conditions Exclusion and to evidence in Miller's medical records as the basis for the denial.

-36-

record reveals that within days of the decision denying his claim, Miller contacted Prudential by telephone and was offered "a sufficiently clear understanding of [Prudential's] position to permit effective review." Id. at 383. In letters dated April 9, 2002 and August 2, 2002, Miller's attorney responded to the proffered bases for denying both his claim and his first appeal, setting forth the reasons Miller believed he was entitled to receive LTD benefits under the Plan. These communications reflect Miller's understanding of the reasons for Prudential's decision and demonstrate that he had an adequate opportunity to respond to the decision. See Terry, 145 F.3d at 39.

Additionally, Miller has not offered any evidence that he was prejudiced by Prudential's failure to strictly comply with ERISA's notice requirements. As the Seventh Circuit has explained, ERISA's notice provision, and the corresponding regulations, were "designed to afford the beneficiary an explanation of the denial of benefits that is adequate to ensure meaningful review of that denial." Halpin v. W.W. Grainger, Inc., 962 F.2d 685, 689 (7th Cir. 1992). Thus, claims for relief based on technical violations of the notice requirement are not permitted, absent evidence that "a precisely correct form of

notice would have made a difference" in the outcome of the claim. Recupero v. New England Tel. & Tel. Co., 118 F.3d 820, 840 (1st Cir. 1997). Miller has failed to adduce any evidence that but for Prudential's failure to notify him of its decision to deny his claim, he would have followed a different course of action or the outcome his claim for benefits would have been different. Despite the procedural violation, Miller was able to file a timely first appeal to Prudential as well as a timely second appeal to the EBC, both of which were afforded thorough consideration and a full and fair review.

Finally, I reject Miller's assertion that the November 21, 2002 letter from the EBC added three new reasons for denying his claim. Rather, the November 21, 2002 letter reiterated the reason that Miller's claim was originally denied: that he was excluded from coverage due to a preexisting condition. The letter then went on to further explain both why Miller's coverage under the Plan was terminated when his STD benefits ended, and why coverage had not been reinstated. In the process, the letter referred to additional Plan provisions, including the sections on "When Benefits Begin and End," "WHEN COVERAGE ENDS," and "ELIGIBILITY." These provisions corroborate and furnish context

-38-

to the Preexisting Conditions Exclusion rather than provide new reasons for the denial.

Having found that substantial evidence in the record supported Prudential's conclusion that Miller had a preexisting condition, that the Plan administrator's interpretation of the Plan's terms was reasonable, and that Prudential's violations of the notice requirements did not prejudice Miller's claim, I grant summary judgment for Nortel as to Count I.

## B.  **Breach of Fiduciary Duty Against Nortel**

In Count II of his complaint, Miller charges that Nortel breached its fiduciary duty as Plan administrator and is liable to him for this breach pursuant to 29 U.S.C. § 1109 [Section 409] and § 1132(a)(2) [Section 502(a)(2)], and § 1132(a)(3) [Section 502(a)(3)].  Nortel challenges Count II, arguing that Miller's Section 409 claim cannot be sustained under Section 502(a)(2) because he has not brought the claim on behalf of the Plan, nor has he sought equitable relief to redress his alleged injury. Nortel is correct.[13]

---

[13]  In his Objection to Defendants' Motion for Summary Judgment, Miller has not put forth any argument as to why summary judgment on this count should be denied.  Nevertheless, Miller's failure to respond does not constitute a waiver of the claim, and

-39-

Civil enforcement for Section 409 lies under Section 502(a)(2), which provides that "[a] civil action may be brought . . . (2) by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title."  29 U.S.C. § 1132(a)(2).  The Supreme Court has determined that a participant may not rely on Section 502(a)(2) to recover damages on his own behalf that are caused by a failure to pay benefits that are recoverable by the participant in an action under Section 502(a)(1)(B).  See Mass. Mut. Life Ins. Co. v. Russell, 473 U.S. 134, 144-47 (1985).  Accordingly, Miller's Section 409 claim must be dismissed.  Tregoning v. American Community. Mut. Ins. Co., 12 F.3d 79, 83 (6th Cir. 1993)(holding plaintiffs not entitled to recover damages in their individual capacities under section 409); Long v. Group Long-Term Disability Benefits for Employees of Fleet Fin. Group, Civ. No. 98-11388-DPW, 1999 U.S. Dist. LEXIS 18656, at *21-*22 (D. Mass. 1999)(same).

For similar reasons, Miller cannot base Count II on § 502(a)(3).  As the First Circuit has explained, "federal courts

I am therefore obliged to examine the merits of Nortel's argument.

-40-

have uniformly concluded that, if a plaintiff can pursue benefits under the plan pursuant to [§ 502(a)(1)(B)], there is an adequate remedy under the plan which bars a further remedy under [§ 502(a)(3)]." Larocca v. Borden, Inc., 276 F.3d 22, 28 (1st Cir. 2002)(collecting cases). Accordingly, because § 502(a)(1)(B) gives Miller the right to obtain benefits that were improperly withheld, he cannot also seek relief for the same injury under § 502(a)(3). See Turner v. Fallon Community Health Plan, Inc., 127 F.3d 196, 200 (1st Cir. 1997); Trombley v. New Eng. Tel. & Tel. Co., 89 F. Supp. 2d 158, 167 (D.N.H. 2000).

Based on the foregoing analysis, then, I grant Nortel's motion for summary judgment as to Count II.

## C. Misrepresentation Claim Against Nortel

In Count IV of his complaint, Miller alleges that during job site interviews in November 2000, and in subsequent pre-hire telephone conversations, Nortel employees, recruiters, and agents represented that the position of senior thin film engineer was a good job with security, good benefits that included long-term disability benefits, and a high potential for success. He also charges that he was assured, via email from Wang, that Nortel would not lay off anyone at its Wilmington plant. Miller then

alleges that he reasonably relied on these representations, which were false, in making the decision to leave his job at Barr Associates and accept employment at Nortel. Lastly, Miller complains that Nortel's misrepresentations have caused him emotional and financial trauma, and caused him to suffer damages, including lost wages and LTD benefits, as well as emotional distress.

Nortel has moved for summary judgment on this claim, arguing that Miller cannot establish either intentional or negligent misrepresentation. Because I conclude that the undisputed facts fail to support a misrepresentation claim, and Miller has failed to point to any disputed facts that would support a different result, I grant Nortel's motion for summary judgment as to Count IV.[14]

--------

[14] Count IV potentially presents a choice of law problem because the events on which the claim is based occurred in Massachusetts, but the case has been filed in New Hampshire. Nortel submits, however, that there is no actual conflict between New Hampshire and Massachusetts law as to the substantive elements of claims for intentional or negligent misrepresentation. Accordingly, it asserts that I need not make a formal choice of law finding because the application of one state's law over the other will not affect the result. Def.'s Summ. J. Br. at 21 n.25, citing to <u>Judge v. Moving Into Maths</u>, No. Civ. 93-213-JD, 1994 WL 262883, at *3 (D.N.H. Jan. 11, 1994). Miller, on the other hand, does not dispute this conclusion. Instead, he

1.    Representations Upon Which Miller Relied Were
      Not Statements of Fact

Nortel argues that the statements on which Miller relies in making his misrepresentation claims are not actionable because they are not statements of fact but merely the non-actionable opinions of current Nortel employees regarding the state of the company.  I agree.  Statements of opinion, even if false, are not actionable as misrepresentations.  "A statement on which liability for misrepresentation may be based must be one of fact, not of expectation, estimate, opinion, or judgment," Zimmerman v. Kent, 31 Mass. App. Ct. 72, 79 (1991).  Nor are false promises generally actionable.  See Hinchey v. NYNEX Corp., 979 F. Supp. 40, 44 (D. Mass. 1997)(noting that promissory statements or opinions about future events ordinarily are not actionable as misrepresentations); Piantes v. Pepperidge Farm, 875 F. Supp. 929, 933 (D. Mass. 1995).  Furthermore, Miller has not presented

proceeds to cite only New Hampshire cases in support of his misrepresentation claims.  Because I agree with Nortel that there is no actual conflict between Massachusetts law and New Hampshire law as to the substantive elements of intentional and negligent misrepresentation, I conclude that I need not determine which state's law applies  See Fashion House, Inc. v. K Mart Corp., 892 F.2d 1076, 1092 (1st Cir. 1989).

any evidence to show that Nortel intended to breach any alleged promise at the time the promises allegedly were made.  See id. These allegedly false statements, therefore, cannot serve as the foundation of a misrepresentation claim.

2.    There is No Evidence The Statements Were
      False When They Were Made

Another defect in Miller's misrepresentation claim is that even if Nortel's representations were statements of fact and not simply opinions or promises, he has not pointed to any evidence that these statements were false *at the time they were made*.  See Rodowicz v. Mass. Mut. Life Ins. Co., 279 F.3d 36, 49 (1st Cir. 2002)(remanding with instructions to enter judgment for defendant employer where evidence showed employer's statements to plaintiff were not false when made); Whelan v. Intergraph Corp., 889 F. Supp. 15, 20 (D. Mass. 1995)(refusing to infer defendant's intent to deceive where plaintiff alleged no specific facts as to defendant's knowledge of statement's falsity).  Miller's bald assertion that Wang was lying when he wrote in an email, "[t]here will be no layoffs here," and his conclusory statements that Wang was being lied to by his superiors, or that his supervisors were negligent in failing to know or disclose material information,

are nothing more than unsubstantiated conjecture.  There is simply no documentary or testimonial evidence to indicate that these statements were untrue.  Indeed, Miller has failed to allege any specific facts that support his claim that any Nortel employee spoke falsely.  Given the scant facts available, I refuse to infer fraudulent intent.  See Whelan, 889 F. Supp. at 20.

Miller also asserts that he was promised a transfer to Nortel's Billerica facility within two months of his start date, and, in the course of pre-employment discussions, was given directions and encouraged to visit this facility.  By this, Miller seems to suggest that because the Billerica facility closed in July 2001, as did the Wilmington facility in 2002, and because he never received the promised transfer, these representations must have been false at the time they were made.  The mere facts, however, that the Billerica facility closed in July 2001 and that Nortel laid off workers in Wilmington are insufficient to establish that these statements were false.  Evidence based solely on conjecture or supposition is inadequate to establish a genuine issue of material fact and defeat summary

judgment.  See Stone & Michaud Ins., Inc. v. Bank Five for Sav.,
785 F. Supp 1065, 1069 (D.N.H. 1992).  This is all Miller offers.
Declining to "enter the realm of surmise," I instead conclude
that Miller has failed to allege specific facts to establish an
essential element of his claim:  that Nortel made false
statements of material fact.  Id.

   3.   There is No Evidence That Nortel Knew or Should
        Have Known The Statements Were False

Miller has also failed to offer any evidence to show that
Nortel representatives knew or should have known that the
statements at issue were false.  See Kaechele v. Nova Info. Sys.,
Inc., No. Civ. 00-313-JD, 2001 WL 1134726, at *4 (D.N.H. 2001).
Again, there is no evidence in the record to indicate that Nortel
personnel wittingly communicated false statements.  See id. at
*5; Whelan, 889 F. Supp. at 20.  Nor has Miller demonstrated that
Nortel employees and recruiters failed to exercise reasonable
care in determining the truth of their statements.  See Finn v.
GenRad, Inc., No. 2000-3292-C, 2002 WL 532607, at *6 (Mass.
Super. Jan. 17, 2002) aff'd, 60 Mass. App. Ct. 1107 (2003).
Miller's speculation that Wang and other Nortel representatives

"either had to know their representations were false, or should have known, but through their own negligence did not," is without support in the record. And although Miller further posits that Wang "did not conduct a reasonable inquiry to determine the truth of his statement," he has not alleged any specific facts or offered any evidence of this allegedly unreasonable conduct.

Miller's misrepresentation claims also fail because his purported reliance on Nortel's allegedly false representations was neither reasonable nor justified. As Nortel points out, when Miller signed his offer letter accepting a job at Nortel, he knew that under the terms of that letter, he was an at-will employee and that Nortel could terminate him at any time and for *any* reason.[15] Miller's contention therefore, that had he been terminated for "some legitimate business reason other than a dramatic reduction in workforce, his reliance on the misrepresentation would have been moot" defies logic and reflects a complete misunderstanding of his at-will status.

---

[15] Miller concedes that under the terms of the offer letter, he was an at-will employee and admits that at-will employees could be terminated at any time and for any reason.

Likewise, it was unreasonable for Miller to rely on "assurances," whether communicated orally or through email, regarding job security and layoffs which clearly conflicted with subsequent written provisions of his offer letter. If he had any question as to the terms of his employment, the reasonable course of action would have been to conduct further inquiry before taking the job. See Trifiro v. New York Life Ins. Co., 845 F.2d 30, 33-34 (1st Cir. 1988)(explaining that a "reasonable person" faced with conflicting information seeks assurances or clarification before relying). There is no evidence in the record that Miller made any additional inquiries or sought clarification of the terms of his employment prior to accepting Nortel's offer.

Lastly, Miller's alleged reliance on the FLEX Benefits Enrollment Guide ("Enrollment Guide") was equally unreasonable. Miller contends that the Enrollment Guide "unambiguously states he would be covered for LTD benefits," and claims that had he been aware that he was subject to Nortel's interpretation of the Plan, he would not have left his job at Barr Associates. Miller has misread the Enrollment Guide. The Enrollment Guide is

clearly not intended to be a comprehensive overview of the eligibility requirements for LTD benefits. It merely serves as an outline of the available benefits options open to Plan participants. The Enrollment Guide also states that "[i]f you are a new hire, and if you become disabled within three months of the effective date of your Nortel Networks LTD coverage, *special rules may apply*." (Emphasis added). It was unreasonable for Miller to assume, without further inquiry, that these special rules would not apply to him. Moreover, the Enrollment Guide refers participants to the Employee Benefits and Programs Binder, which contains the SPD, and urges them to either visit the Employee Services website or call the Employee Services telephone number for additional information about how the Nortel benefits program operates. Id. at P-MILLER 0101. Again, there is no evidence that Miller took advantage of these additional resources or sought additional information about his eligibility for LTD benefits prior to accepting Nortel's offer of employment. See Trifiro, 845 F.2d at 33-34.

I therefore grant Nortel's motion for summary judgment as to the misrepresentation claims.

## IV.  CONCLUSION

For the reasons outlined above, I grant Nortel's motion for summary judgment as to Counts I, II, and IV (Doc. No. 15), and deny Miller's motion for summary judgment (Doc. No. 14).  The clerk shall enter judgment accordingly.

SO ORDERED.

_____
Paul Barbadoro
United States District Judge

January 25, 2005

cc:  John J. LaRivee, Esq.
     Jonathan D. Rosenfeld, Esq.
     Mary E. Tenn, Esq.